Filed 8/29/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| KATIE MCCLAIN et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> KAREN KISSLER et al., <br><br>     Defendants and Appellants. | A152352 <br><br> (Sonoma County <br> Super. Ct. No. SCV258139) |

Plaintiffs Katie McClain and Jonothan Harrell filed suit against defendants Karen Kissler (both individually and doing business as Karen Kissler, Esquire and a medical marijuana collective called "Alternatives"), alleging defendants failed to pay them for their work growing marijuana as agreed under a contract between them. Although the summons and complaint had been served on defendants, and both before and after being served they actively participated in the case, defendants failed to file an answer or other responsive pleading. And though they claimed they had some basis to challenge the validity of service, they didn't file a motion to quash service of process either. In short, while they appeared in the case in various ways, as to the complaint they did nothing, assuming an ostrich-like posture.

About six months into the case, a case management conference (CMC) took place. The order entered immediately after the CMC is the focal point of this appeal. At the CMC, the trial court warned defendants their response to the complaint was long overdue and that to challenge the validity of service they had to file a motion to quash. In addition, because the California Rules of Court impose on every plaintiff a 10-day deadline to take a defendant's default on pain of possible sanctions and that deadline, too, had long since passed, the court ordered the plaintiffs to take the defendants' default by a

1

specified date or else be sanctioned. The court memorialized its ruling in a minute order the defendants would later claim they misunderstood. Two weeks after the CMC, defendants still had neither answered nor moved to quash service, and plaintiffs, under threat of sanctions, took their default and sought entry of a default judgment.

In the meanwhile, Kissler was vigorously and successfully pursuing two cases she had previously filed against plaintiffs, one an unlawful detainer action in which she obtained a writ of execution to remove plaintiffs from her property, and the other a breach of contract action that alleged plaintiffs, rather than Kissler et al., had breached the contract that is the subject of this action. But once the default was entered against Kissler in this case, Kissler obtained a discovery ruling in her separate contract action that, contrary to the allegations in her own complaint, deemed plaintiffs to have admitted Kissler was not a party to the contract at issue here, i.e., the very contract upon which she herself had brought suit and thereafter she obtained summary adjudication in her favor based on that deemed admission.

Also after the default was entered in this case, Kissler unleashed a torrent of filings in an effort to set the default aside, on a plethora of grounds—she believed defendants had not been properly served, thought they could raise jurisdictional challenges at any time, didn't know their participation in the case was a general appearance, and interpreted the CMC order imposing the deadline for plaintiffs to take defendants' default as an extension of time for *defendants* to file their already long overdue response to plaintiffs' complaint. Kissler also claimed Alternatives was in any event entitled to mandatory relief because she had eventually filed a declaration of fault. After multiple rounds of briefing and multiple hearings, the trial court issued an order denying relief from the default on every ground defendants had asserted.

Now, on appeal from the resulting default judgment, defendants raise two issues. They contend the trial court abused its discretion in denying them discretionary relief from default under Code of Civil Procedure section 473, subdivision (b) (section 473(b))[1]

---

[1] Further statutory references are to the Code of Civil Procedure.

on the ground of their excusable mistake, because they misunderstood the court's minute order from the case management conference to mean it had given *them* until the 37-day deadline to file an answer or a motion challenging service of the summons and complaint. The entity, Alternatives, also contends that the court in any event had a mandatory duty under the same provision to grant it relief from default because its lawyer, Kissler, filed a declaration of fault.

We affirm. The trial court did not abuse its discretion in denying relief under section 473(b) for excusable mistake, finding defendants were not mistaken about the meaning of the court's minute order. The record here amply supports the trial court's findings that defendants' failure to respond to the complaint in this case was knowing and deliberate. And even if Kissler had been genuinely mistaken, the trial court did not abuse its discretion in finding any mistake was inexcusable. The record reflects that she was fully capable of ascertaining the rules and using them to her advantage when it suited her. Indeed, to interpret the discretionary relief provision of section 473, as defendants urge us, to require relief in circumstances like these would reward parties who ignore or flout the most basic rules governing civil actions, resulting in delay and congestion of the courts, and would undermine trial courts' ability to conduct proceedings in a way that is fair, efficient and orderly, and serves the interest of *all* litigants. There is, to be sure, a policy in favor of trying cases on their merits. And it is an important one. But there are other policies reflected in the requirement of section 473(b) that relief be granted only where a party has made an honest and reasonable mistake, policies implicating judicial efficiency, a fair legal process and timely access to the courts. If relief from default were required in a case like this, no case would merit denial of relief and the Legislature might as well make such relief mandatory in all circumstances. The Legislature has not chosen that path and for good reason. (See *Zamora v. Clayborn Contracting Group, Inc.*(2002) 28 Cal.4th 249, 258 (*Zamora*) [" 'Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not . . . excusable. To hold otherwise would be to eliminate

3

the express statutory requirement of excusability and effectively eviscerate the concept of attorney malpractice"].) Neither will we.

We also conclude that the trial court did not err in denying mandatory relief to Alternatives under section 473(b), because the court found it was "one and the same" party as Kissler, who is an attorney. The attorney declaration of fault she filed thus was of no legal effect for purposes of granting mandatory relief from default.

## BACKGROUND

We begin by observing that the record provided by defendants on appeal is deficient and one-sided. It contains no pleadings, briefs or other filings between the date the amended complaint was filed in January 2016 and the date on which plaintiffs sought entry of default in June 2016. Further, it contains many gaps thereafter where pleadings and briefs are omitted. It leaves out, for example, the notice of pending action, or lis pendens, filed by plaintiffs and the defendants' motion to expunge the lis pendens. It also omits the proofs of service of the complaint or amended complaint (one cannot tell which) filed by plaintiffs and declarations plaintiffs filed in opposition to defendants' motions for relief from default. And defendants omitted reporters' transcripts of two of the three hearings on the motions at issue in this appeal.[2] To some extent we are able to assess what occurred in the case because, as required by rules 8.122(b)(1) and 8.124(b)(1)(a) of the California Rules of Court, defendants included the register of actions in the appendix, which lists the many items that have been omitted. The statement of facts here is based on the register of actions where necessary. As we will discuss further, below, however, where omitted items are necessary to our review, our

---

[2] The docket shows there were three hearings on Kissler's motions for relief from default, one on November 30, 2016 before Judge Nadler, another on March 15, 2017, before Judge Ottenweller, and a third on May 24, 2017, also before Judge Ottenweller. Defendants failed to submit transcripts of the first two hearings though they included the third and final one. Nor did defendants include the transcript of a June 16, 2016 case management conference before Judge Nadler, which bears significantly on defendants' claim of mistake and excuse and Judge Nadler's related findings. However, we granted a request by plaintiffs to augment the record to add that transcript.

4

inability to conduct that review redounds to defendants' detriment. (See *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1200–1201 (*Hearn*) [in connection with review of denial of relief under section 473 "it is the appellant's burden to furnish a record adequate for review" and "[w]e must therefore presume that what occurred at [a hearing for which appellant has not furnished a reporter's transcript] supports the judgment"].)

## I.

### *Proceedings in This Action*

In December 2015, plaintiffs sued Kissler, individually and doing business as "Karen Kissler, Esq." and "Alternatives." We refer to Kissler and her Esq. and Alternatives dbas as "defendants." Plaintiffs alleged Kissler breached a contract in which she retained them to raise marijuana plants at a property in Geyserville agreeing to pay them for raising and trimming the plants. Instead of paying for the plants as agreed, plaintiffs alleged defendants' agents came to the property without notice, removed all the plants and the equipment used to grow them and paid only $14,000 of the $158,500 they had promised to pay. They sought the difference as damages along with interest according to proof. A few weeks later, plaintiffs amended the complaint to add an allegation that Kissler listed some property in Guerneville for sale in violation of the fraudulent conveyance statute, Civil Code section 3439.04.

In the meanwhile, plaintiffs filed a notice of lis pendens and, on December 28, 2015, defendants moved to expunge the lis pendens. All of them were represented by Kissler, who is a practicing attorney. In connection with that motion, Kissler filed a motion and a reply declaration and presented an ex parte motion to shorten time for hearing. In her motion, although Kissler apparently claimed she was "specially appearing" on her own behalf and behalf of the other defendants, she did not assert that defendants had not been properly served with process or otherwise challenge the exercise of personal jurisdiction against them.

On January 20, 2016, while the defendants' lis pendens motion was pending, plaintiffs served the summons and complaint by substituted service on both Kissler and Alternatives. Thereafter, in February 2016, the trial court granted the defendants' motion to expunge the lis pendens.

After that, Kissler and the other defendants did an about-face. In April 2016, Kissler filed a declaration claiming, remarkably, that *she had not been aware of the case* or that she was a party to it. Her declaration also claimed she had not been served with process in the case. A week later, plaintiffs filed a proof of service showing that, in January 2016, the summons and complaint had been served on Kissler individually and dba Karen Kissler, Esq. and on Alternatives.

Kissler failed to appear at a CMC on April 7, 2016, and so the court issued an order to show cause as to Kissler and continued the CMC for a hearing on June 16, 2016. Prior to the CMC, Kissler re-surfaced and filed additional papers: a case management statement (on April 25, 2015), and a "Notice of Nonavailability of Counsel" (in May 2016) claiming she would be unavailable during a six-week period beginning in July 2016.

At the June 16, 2016 CMC before Judge Gary Nadler, Kissler appeared (again, purportedly "specially") on behalf of herself and her law firm, and it was this hearing that resulted in entry of the minute order that defendants now claim they misunderstood. The following colloquy about the state of the pleadings ensued:

"THE COURT: . . . Apparently, Ms. Kissler was arguing she was not properly served. I don't know whether that is true. I'm not going to determine that today, but *either we get an answer from Ms. Kissler or you take a default on this case*. And if not, I will be considering sanctions on that. Is this case different from what I just called?

"MS. McCLAIN: Yes, it is.

"THE COURT: So what I'm going to do is, since I don't have an answer from Ms. Kissler, I'm speaking to you [plaintiff] now. I'm going to order you to file a proof of

6

service. I guess you already have. You may want to find out why Ms. Kissler—why she thinks she's not been properly served. That's up to you. If you don't want to speak to her, that's fine. *But I will give you 30 days from today's date to file a default. I will give you an exact date so we're clear on that.* [¶] "Make that July 22nd, 2016. Again, *that's the last date to which you may get a default entered in this matter.*

"Ms. Kissler, I assume you filed some sort of motion to quash. That's for you folks to figure out. And if it comes before my desk, then I will handle it.

"I'm going to give this one more date for an order to show cause. And what I mean by that is this: You have an obligation either to get it served, and if you get it served and the default taken—and you're well beyond what is required in the California Rules of Court time-wise to have taken care of this matter.[3] Again, *if you feel that service was proper, then you take the default. You have the time limit I've given you as [your] outside time limits. If you fail to comply with that, then unless there is good cause, then I will consider imposing sanctions on this case*, failure to comply with California Rules of Court. So one more order to show cause." (Italics added.)

The court's minute order from the June 16, 2016 status conference was, as is typical, more abbreviated (omitting any reference to possible sanctions). In relevant part, it stated, "Court notes proof of service was due as to Defendant Alternatives no later than March 9, 2016. As to counsel KISSLER'S statement that she [was] improperly served, the Court notes proof of service was filed. Upon conclusion of discussion, the Court orders as follows: *No later than July 22, 2016, a default must be filed for Defendant Karen Kissler ind. & dba Karen Kissler Esq. unless an answer has been filed*. As to statements regarding improper service, a motion must be filed." (Italics added.)

---

[3] The court was no doubt referring to rule 3.110(g) of the Rules of Court, which imposes on every plaintiff a 10-day deadline to take a defendant's default on pain of possible sanctions.

7

The court continued the CMC to September 15, 2016. It served a copy of the minute order on the parties the day after the hearing.

Plaintiffs did not immediately seek defendants' default after the status conference. By June 29, 2016, almost two weeks after the hearing, Kissler still had neither answered the complaint nor filed a motion to quash service of summons. Finally, on that date, plaintiffs filed a request for entry of defendants' default on plaintiffs' damages claim of $144,500, plus interest and attorney fees to be determined. The court clerk entered the default.

Over the next eleven months, defendants filed numerous papers (motions, declarations and other filings), many on the eve of or on the date of hearings, which necessitated continuance after continuance to enable plaintiffs to respond meaningfully, that, in substance, asked the court both to set aside the entry of default under section 473(b) and to quash service of the summons and complaint. Many, but by no means all, of the defendants' numerous filings are in the record. Virtually none of the opposition papers that plaintiffs filed are in the record, including *none of the plaintiffs' evidence*. One of the few filings concerning the entry of default that defendants have included in the appellate record is a document entitled "Notice of Motion and Motion to Vacate Entry of Default and/or Default Judgment," filed on November 30, 2016. Another was an "Attorney Affidavit of Fault," filed on November 2, 2016, stating defendants had not been served, Kissler "was under the mistaken impression that jurisdiction could be raised at any time during the case," she believed that if she appeared "specially" it would not constitute a general appearance, and she interpreted the court's June 16, 2016 order to mean the court was granting *her* "permission" to file a motion to quash until July 22, 2016.

The parties' lengthy filings culminated with three hearings, before two different judges.

8

On November 30, 2016, Judge Nadler, who had set the earlier deadline for plaintiffs to take the default, denied Kissler's motion to quash service of process. But rather than adopt his tentative ruling fully, which had been to deny *all* requested relief to defendants, including relief from default, Judge Nadler continued defendants' request for relief from default to another date, apparently because Kissler had filed a new declaration on the day of the hearing to which plaintiffs thus had no opportunity to respond.

Judge Nadler did, though, enter detailed, adverse findings in his November 30, 2016 order. He observed that *Kissler had filed a motion to expunge lis pendens in December 2015 without challenging "the service of summons and complaint or the personal jurisdiction in any way"* and that *defendants "also took part in this litigation subsequently without challenging service or personal jurisdiction*." (Italics added.) He ruled that the defendants thus had made a general appearance in the case that forfeited any objection to defective service. Judge Nadler also found it was "clear from Defendants own papers that, regardless of any possible defect in service, [*Kissler*] *was entirely aware of the lawsuit and who the Defendants were as far back as December 2015, when they filed the motion to expunge lis pendens*." He also found that despite service having taken place or been attempted in January 2016 "and *despite discussing the issue with Plaintiffs and the court at the June 16, 2016 Case Management Conference (at which time this court informed the parties that Plaintiffs had until July 22, 2016 to seek Defendants' default and that Defendants needed either to file an answer or bring a motion to challenge service of the summons and complaint), Defendants did nothing until after Plaintiffs had already entered their default*."

Defendants' motion to vacate the entry of default was subsequently re-set for hearing before Judge Peter Ottenweller, to whom the case had apparently been reassigned. Judge Ottenweller eventually heard the motion on May 24, 2017, after allowing the parties to file additional papers and to bring in new counsel and took the matter under submission.

9

On June 20, 2017, the court denied the defendants relief from default under section 473(b). In his five-page written order, Judge Ottenweller rejected defendants' claim of excusable mistake and neglect based on their having allegedly interpreted Judge Nadler's June 2016 CMC order to mean they had until July 22, 2016, to answer the complaint. Judge Ottenweller found that "[t]he order . . . could not reasonably be interpreted as allowing Defendants to do nothing and wait for Plaintiffs to file, or not file, a default by the deadline given. At no point did the court indicate that Defendants could bring the motion to quash up through July 22, 2016 without the threat of a default being entered earlier and at no point did the court indicate that a motion to quash would be granted. Plaintiffs entered the default within the deadline given, a deadline of which Defendants were expressly aware." In addition, like Judge Nadler before him, Judge Ottenweller also found that "the history of Defendants' conduct, which resulted in the default being possible, makes it glaringly clear that for months Defendants *knowingly failed to answer or file other* appropriate *challenge to the pleading or service* despite not only knowing of the action, but actually taking part in it." (Italics added.)

Judge Ottenweller also rejected defendants' argument that Kissler's "affidavit of fault" entitled Alternatives to mandatory relief under section 473(b). Finding there was "no distinction between Ms. Kissler and Alternatives," which, it observed, "[s]he founded, established and is its CEO, Secretary and CFO," and further noting "there are no other corporate officers" and "[s]he reports only to herself," the court found Kissler's errors and decisions were also attributable to Alternatives. Kissler "was also the owner and CEO of Alternatives, making the decision in both that capacity and as the attorney." Because "[r]elief is not mandatory based on an attorney affidavit of fault where the fault is also that of the party," Alternatives was not entitled to mandatory relief under section 473(b).

10

On June 30, 2017, the court entered the default judgment against defendants for $169,353, consisting of $144,500 in damages, $24,743 in prejudgment interest and $110 in costs. This appeal from the judgment followed.

## II.

### *Parallel and Related Proceedings*

The record includes documents relating to the two other cases between the parties, one of which, at least, was assigned to the same department as the instant case. We briefly summarize the relevant proceedings in those cases. Kissler offered certain evidence about those cases in support of defendants' motion for relief from default.

On November 30, 2015, twenty days before plaintiffs filed this case, Kissler and another entity, Kissler Management Consulting (KMC) (an "unincorporated agent"), sued McClain[4] and Harrell. Alternatives was not named as a party in the complaint. The complaint, which is signed by Kissler in pro per, asserted two claims, one for breach of contract and the other for breach of implied contract and constructive trust. It alleged that Kissler and KMC entered into a written contract with McClain and Harrell. It further alleged that Kissler owned certain properties in Guerneville and Geyserville, California, that KMC was an "authorized agent for Alternatives," that Harrell and McClain agreed to grow organic medicinal plants for KMC, that Harrell and McClain would be allowed to live rent-free in Kissler's Geyserville home, provided an off-road vehicle for their use, and be paid a per pound price to trim the plants, and that McClain and Harrell harvested and seized the plants at this location. Kissler and KMC further alleged that McClain and Harrell by their conduct impliedly agreed and understood that Kissler and KMC would rely on their alleged skills, efforts and labors to grow medicinal quality cannabis, that Kissler and KMC entrusted "their property" to McClain and Harrell to manage, care for and to account for upon request at the termination of the contract, and that when Kissler and KMC requested an accounting of the readiness of the Guerneville plants, McClain

---

[4] In that case, McClain is referred to as Katie McClain Mengali. For consistency and to avoid confusion, we shall refer to her as McClain throughout.

11

and Harrell failed to respond and breached the trust by refusing to turn over the plants. The complaint attaches a document that is alleged to be the written contract, which states it is "between Katie McLain [*sic*], and Jonathan [*sic*] Harrell and Alternatives, a Health Collective (by Director, Karen Kissler). It is entitled "Agreement to Grow" and consists of a paragraph purporting to obligate "Katie and Jonathan [*sic*]" to "grow beautiful medicinal marijuana at the farm (23000 Pocket Ranch Rd. Geyserville) for Alternatives (which owns the plants," and to provide security for the plants "by living at the farm as much as possible during the growing and trimming season (except when Karen and family are staying there)." We will refer to this case, which bore the number SCV 258091, for convenience as the "Kissler case."

Besides the Kissler complaint, defendants submitted in support of their motion for relief from default in this case two minute orders from that case, the first dated December 14, 2016, from the Law and Motion calendar pertaining to a "Motion for Terminating Sanctions re Katie McClain." In it, the court denied Kissler's and/or KMC's motion for terminating sanctions against Harrell and McClain, found the motion to be "premature," and found there was "insufficient evidence that [McClain and Harrell] acted willfully or intentionally" and that "[t]here ha[d] been an attempt to comply." The court further stated that although McClain and Harrell's responses to interrogatories were "five days late" and contained objections, they "did not knowingly and intentionally violate a court order." The court gave them a week to respond without objections to the interrogatories. As to requests for admission, based on an earlier order it held they were "deemed admitted upon the request by counsel Kissler."

The second minute order, dated March 8, 2017, granted KMC's motion for summary adjudication, based on the prior order providing that requests for admissions be deemed admitted. Specifically, pursuant to those requests, McClain and Harrell had admitted—an admission Kissler sought despite her complaint's allegation that she and her consulting company (KMC) had entered into a written contract with McClain and Harrell—"that Plaintiff was not an individual party to the contract at issue in this matter" and "[t]herefore, there are no triable issues as to any liability or exposure with respect to

12

Plaintiff Karen Kissler (hereafter 'Kissler') individually or as an attorney herein."  The court also noted that McClain and Harrell had not provided evidence "to counter Plaintiff[s'] evidence contained in their separate statement."

One more document pertaining to the Kissler case is an order from Division Five of this court granting Kissler's unopposed motion to dismiss McClain and Harrell's appeal from the order granting summary adjudication on the ground that such an order is not an appealable order until a final judgment is entered.

These documents were attached to a declaration of an attorney in support of defendants' motion filed in May 2017.

In a reply brief Kissler filed in support of the motion to quash and for relief from default in October 2016, she also stated there was a third case "involving the same parties, *Kissler v. Mengali, Harrell*, Case No. SCV-257938," which was an unlawful detainer action Kissler filed "to remove [McClain and Harrell] from her farm." According to the reply brief, Kissler succeeded in obtaining "a Writ of Execution from Judge Gnoss which the Sheriff served on Defendants who refused to vacate" and damages were "still outstanding and are the same as those damages requested in *Kissler, et al. v. Mengali, et al.*, Case No. SCV 258091."

## DISCUSSION
### I.

***Defendants Have Failed to Show the Trial Court Abused Its Discretion in Denying Relief from Default Under Section 473(b).***

**A. Standards Governing Our Review**

As noted, although in the trial court defendants sought to be relieved from their default on numerous grounds, on appeal they challenge the trial court's denial of relief solely on two grounds:  they made an excusable mistake in misinterpreting the June 16, 2016 case management order, and Alternatives was entitled as a matter of law to relief because of Kissler's declaration of attorney fault.

Our review of the trial court's ruling is highly deferential.  As this court explained in *Fasuyi v. Permatex, Inc*. (2008) 167 Cal.App.4th 681, 694:  "Section 473,

13

subdivision (b) states that a court 'may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect.'  This part of section 473 is recognized as invoking the trial court's discretion, and the judgment of the trial court ' "shall not be disturbed on appeal absent a clear showing of abuse." '  (*Zamora*[, *supra*,] 28 Cal.4th [at pp.] 254, 257.)"

Defendants "correctly observe[] that a trial court order denying relief under section 473, subdivision (b) is ' "scrutinized more carefully than an order permitting trial on the merits." '  [Citation.]  'Because the law favors disposing of cases on their merits, "any doubts in applying section 473" must be resolved in favor of the party seeking relief from default [citations].'  (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980 [*Rappleyea*].)  But that said, '[a] motion to vacate a default and set aside judgment (§ 473) "is addressed to the sound discretion of the trial court, and in the absence of a clear showing of abuse . . . the exercise of that discretion will not be disturbed on appeal." [Citations.]  Moreover, all presumptions will be made in favor of the correctness of the order, and the burden of showing abuse is on the appellant.' " (*Hearn*, *supra*, 177 Cal.App.4th at p. 1200.)

As Division Three of this court stated in *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, "The standard for appellate review of an order denying a motion to set aside under section 473 is quite limited.  A ruling on such a motion rests within the sound discretion of the trial court, and will not be disturbed on appeal in the absence of a clear showing of abuse of discretion, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice.  Where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the correct result for the decision of the trial court.  [Citations.]  ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " [Citations.]' [Citation.] The burden is on the complaining party to establish abuse of discretion, and the showing

14

on appeal is insufficient if it presents a state of facts which simply affords an opportunity for a difference of opinion." (*Id.* at p. 118, fn. omitted.)  To obtain discretionary relief under section 473, the moving party must show the requisite mistake, inadvertence, or excusable neglect.  (*Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474, 1478, quoting *Iott v. Franklin* (1988) 206 Cal.App.3d 521, 526–528 (*Iott*).)

In *Zamora*, our high court reiterated the limited nature of our review.  It explained that " 'A party who seeks relief under section 473 on the basis of mistake or inadvertence of counsel must demonstrate that such mistake, inadvertence, or general neglect was excusable because the negligence of the attorney is imputed to his client and may not be offered by the latter as a basis for relief.' [Citation.]  In determining whether the attorney's mistake or inadvertence was excusable, 'the court inquires whether "a reasonably prudent *person* under the same or similar circumstances" might have made the same error." ' [Citation.]  In other words, the discretionary relief provision of section 473 only permits relief from attorney error 'fairly imputable to the client, i.e., mistakes anyone could have made.' [Citation.]  'Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable.' " (*Zamora*, *supra*, 28 Cal.4th at p. 258.)

The concept of "excusable," furthermore, is not synonymous with a get-out-of-jail-free card for parties who later come to regret past inaction or sitting on their rights. " 'The inadvertence contemplated by the statute does not mean mere inadvertence in the abstract.  If it is wholly inexcusable it does not justify relief.  [Citations.]  It is the duty of every party desiring to resist an action or to participate in a judicial proceeding to take timely and adequate steps to retain counsel or to act in his own person to avoid an undesirable judgment.  Unless in arranging for his defense he shows that he has exercised such reasonable diligence as a man of ordinary prudence usually bestows upon important business his motion for relief under section 473 will be denied.  [Citation.]  Courts neither act as guardians for incompetent parties nor for those who are grossly careless of their own affairs. . . .  The only occasion for the application of section 473 is where a party is unexpectedly placed in a situation to his injury without fault or negligence of his

15

own and against which ordinary prudence could not have guarded.' " (*Hearn, supra*, 177 Cal.App.4th at p. 1206.

Most of these questions are factual ones to be resolved by the trial court, not this court. " 'The issue of which mistakes of law constitute excusable neglect presents a fact question; the determining factors are the reasonableness of the misconception and the justifiability of lack of determination of the correct law.' " (*Coordinated Const., Inc. v. J.M. Arnoff Co.* (1965) 238 Cal.App.2d 313, 319; accord, *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 346; *Toho-Towa, Ltd. v. Morgan Creek Productions, Inc.* (2013) 217 Cal.App.4th 1096, 1111.) In reviewing the trial court's factual findings regarding excuse and diligence, we defer to the trial court's assessments of credibility and the weight of the evidence and do not interfere with its determinations of these matters. (*Coordinated Const., Inc.*, at p. 319; accord, *Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622–623; *Warren v. Warren* (2015) 240 Cal.App.4th 373, 377 ["On appeal from an order denying relief from default or a default judgment, we will not disturb the trial court's factual findings where they are based on substantial evidence"].)

In dissent, our colleague emphasizes the Supreme Court's observation in *Rappleyea v. Campbell*, *supra*, 8 Cal.4th 975 that appellate courts give greater scrutiny to denials, than to grants, of discretionary relief. (Dis. opn. at p. 21.) The court made that observation in *Rappleyea*, and we have no quarrel with it. But we do not understand it to mean that appellate courts are to abandon the abuse of discretion standard of review when a trial court denies relief from default. *Rappleyea* itself clearly states otherwise, observing that "a challenge to a trial court's order denying a motion to vacate a default," whether on equitable grounds or under section 473, is still the "abuse of discretion" standard. (*Rappleyea*, at p. 981.)[5] Moreover, as our colleague points out, *Rappleyea*

---

[5] *Rappleyea* itself was a narrow holding, on quite unique facts, in which plaintiffs were held entitled to equitable relief from default due to a constellation of incomplete and erroneous advice they received, both from a court clerk (about the required filing fee for

16

referred to the policy in favor of deciding cases on their merits that must inform decisions whether to grant relief from default and observed that where there are doubts they should be resolved in favor of granting relief. (*Id.* at p. 980.) But *Rappleyea* did not indicate courts should myopically focus on that policy alone and grant relief in every case or that courts should be unceasingly lenient with careless litigants. On the contrary, our high court warned that it was not suggesting litigants, even self-represented litigants, could ignore the rules and then ask for leniency. "[W]e make clear that mere self-representation is not a ground for exceptionally lenient treatment. Except when a particular rule provides otherwise, the rules of civil procedure must apply equally to parties represented by counsel and those who forgo attorney representation." (*Id.* at pp. 984–985.) The court recognized countervailing considerations counseling against such "exceptionally lenient treatment." "A doctrine generally requiring or permitting exceptional treatment of parties who represent themselves would lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation." (*Id.* at p. 985.)

We now proceed to apply the abuse of discretion standard as it applies in the circumstances of this case.

## B. Excusable Mistake

Turning first to the question of defendants' claimed misinterpretation of the CMC order, defendants have not shown the trial court abused its discretion, much less clearly so, in rejecting that proffered excuse for their having failed to respond timely to the complaint.

---

their answer) and then from opposing counsel who had taken their default a mere eight days after their answer had been rejected for filing because of a filing fee problem (misadvising them that they couldn't seek relief from the default). (*Rappleyea, supra,* 8 Cal.4th at pp. 978–979.) In holding plaintiffs were entitled to equitable relief, the Supreme Court noted the case's "odd facts" and emphasized its ruling was a narrow one. (*Id.* at pp. 982, 984 ["We draw our conclusion narrowly. The clerk's error and plaintiff's incorrect statement of the law together persuade us that the court abused its discretion when it denied defendants' motion"].)

To start with, defendants have not provided an adequate appellate record for us to consider this issue. As already indicated, defendants included in their appendix some, but not all, of their own filings relating to the motions for relief from default and omitted *all* the declarations and memoranda submitted by plaintiffs in opposition, which the register of actions indicates plaintiffs filed. Thus, the record contains *none* of the evidence plaintiffs introduced. That alone is grounds to deem this issue forfeited, because without a record of all of the evidence introduced on the contested motion the presumption of correctness compels us to affirm the judgment. (See, e.g., *Hearn*, *supra*, 177 Cal.App.4th at pp. 1200–1201 *Godfrey v. Oakland Port Services Corp.* (2014) 230 Cal.App.4th 1267, 1283–1284 [Brick, J., with Kline, P.J. and Richman, J. concurring].) And making matters worse, defendants also failed to provide the reporter's transcripts for two of the three hearings at which Judges Nadler and Ottenweller heard their motions for relief from default and for the hearing at which Judge Nadler made the order Kissler claims to have misunderstood (although we granted plaintiffs' request to augment the record to add the last). These omissions violate rule 8.124(b)(1)(B) of the Rules of Court and leave us with a one-sided and incomplete record in regard to the evidence offered and arguments made by the plaintiffs and the judge's exercise of discretion. "As the party challenging a discretionary ruling, [defendants] had an affirmative obligation to provide an adequate record so that we could assess whether the court abused its discretion." (*Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259 [challenge to court's denial of discretionary relief from default held forfeited by failing to provide hearing transcript or copy of ruling].) Although plaintiffs have not raised any concern about the one-sided and woefully incomplete record, we ourselves are in no position to speculate or second-guess the trial court on discretionary matters as to which defendants have impeded our review.[6]

---

[6] The dissent suggests we should ignore this problem because plaintiffs have not argued it. (Dis. opn. at p. 24.) But an adequate record is critical to our ability to review the trial court decision, especially its factual findings. Without one, we must infer all missing portions of the record support the trial court's decision.

Even considering the issue on the merits on the basis of this limited record, however, there was no abuse of discretion, much less clear abuse. The issue is not even close.

*First*, the trial court was entitled to find—and did find—that Kissler was not credible and that she did not make the factual mistake she claimed to have made. Judge Ottenweller expressly found that "Plaintiffs entered the default within the deadline given, *a deadline of which Defendants were expressly aware*." (Italics added.) Implicit in this finding is that the defendants *knew* the deadline applied *to the plaintiffs* and was simply a deadline *for the plaintiffs to take a default*. Judge Ottenweller thus found that Kissler understood Judge Nadler was not granting defendants some kind of retroactive (and unsought) extension of time to respond to the complaint, but rather was holding *plaintiffs'* feet to the fire to take the defendants' default by a date certain. Judge Ottenweller further found that "the history of Defendants' conduct, which resulted in the default being possible, makes it glaringly clear that for months Defendants *knowingly failed to answer or file other* appropriate *challenge to the pleading or service* despite not only knowing of the action, but actually taking part in it." (Italics added.)[7] Again, Judge Ottenweller did not believe Kissler's claim that she thought she had no obligation to respond to the complaint and could instead wait and challenge jurisdiction at some future date whenever she chose. We are required to defer to the trial court's factual finding that there *was* no mistake unless there is no substantial evidence to support it. On this record, even without a complete record, there is ample evidence to support the court's finding.

---

[7] Judge Ottenweller gave similar indications at the final hearing on the motion, when he suggested Kissler had acted as she did deliberately, for tactical reasons, rather than by mistake. When defendants' newly retained counsel argued that Kissler's "mistake" in "interpret[ing]" Judge Nadler's CMC order was excusable, Judge Ottenweller interjected: "Ms. Kissler then, in response to that complaint on May 9th, 30 days before this OSC hearing, says that she's filing a notice of unavailability for certain periods of time. Clearly, she understood and had this complaint since its proof of service but did nothing until her motion that she sought to quash. Why the delay?"

19

Moreover, we must defer to the trial judge's assessment of Kissler's credibility. (*Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 828 ["It is the province of the trial court to determine the credibility of the declarants and to weigh the evidence"].) Only honest mistakes are grounds for relief under section 473. (See *Solv-All v. Superior Court* (2005) 131 Cal.App.4th 1003, 1008 [affirming denial of discretionary relief where there was reason to question credibility of defendant's attorney regarding his awareness of potential for default].) The question whether Kissler was genuinely mistaken about such basic rules governing litigation practice she claimed not to have understood[8] and truly "misinterpreted" Judge Nadler's CMC order turned turn on her credibility, which the trial court had strong reasons to question. To start with, Kissler had lied under penalty of perjury at least once before, claiming to know nothing about the case long after she had begun to participate in it.[9] In addition, the background of what had already transpired was so unreasonable that it strained credulity to believe a practicing lawyer was so

_____

   [8] These include that she was required to move to quash before otherwise participating in the case to preserve any jurisdictional challenge (see § 418.10, subds. (d), (e); *Hamilton v. Asbestos Corp., Ltd.* (2000) 22 Cal.4th 1127, 1149; *Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 51–54), that she could not simply ignore the complaint without risk of a default even if she believed service had been improper in some way (see § 585, subd. (a) [clerk shall enter default in contract action in amount specified in complaint if defendants have been served and no answer, demurrer, or motion to quash is filed within time specified by summons]), and that participation in the litigation, whether or not she designated appearances as "special," constituted a general appearance that waived jurisdictional defects. (See *Dial 800*, at p. 52; *Szynalski v. Superior Court* (2009) 172 Cal.App.4th 1, 10.)

   [9] Judge Ottenweller found that after actively participating in the case since December 2015, Kissler had "filed a 'declaration' on April 7, 2016 claiming that she only just discovered the previous day that she was a named defendant in this lawsuit, she had not been served in this lawsuit, she was not aware until then that she was a party to this lawsuit, and 'the only litigation [she was] aware of between the parties [was her] own lawsuit (SCV 258091) as plaintiff . . . against' the plaintiffs in this action." Judge Nadler had already rejected these assertions, finding it "clear from Defendant['s] own papers that, regardless of any possible defect in service, *Defendant was entirely aware of the lawsuit and who Defendants were as far back as December 2015*, *when they filed the motion to expunge lis pendens*." (Italics added.)

20

ignorant of basic rules that she would think that at the June 16 hearing Judge Nadler was indulging her in yet additional delay, rewarding by giving her even more time to respond. And there was evidence of Kissler's *successful* litigation activity in this and the two cases she had filed, [10] which undermined her claim of legal naivety and misunderstanding of Judge Nadler's order. And there were additional bases, besides Kissler's notices of unavailability, to infer she was engaged in an effort to delay rather than having truly been mistaken. It is difficult to conceive of any purpose *other* than delay for these California defendants to have claimed technical defects in service when they had actual knowledge of the case and were already participating in it. And delay in plaintiffs' case potentially advantaged defendants, allowing the cases Kissler had filed against plaintiffs to proceed while the case plaintiffs had filed against defendants languished. All of this buttresses the trial court's finding that Kissler was *not* credible in claiming to have been mistaken about the meaning of Judge Nadler's June 16, 2016 order.

*Second*, even if Kissler had been subjectively mistaken about Judge Nadler's order, the record supports the trial courts' finding that her interpretation was not *reasonable* under the circumstances. Judge Ottenweller found that the order "could not reasonably be interpreted as allowing Defendants to do nothing and wait for Plaintiffs to file, or not file, a default by the deadline given. At no point did the court indicate that Defendants could bring the motion to quash up through July 22, 2016 without the threat of a default being entered earlier and at no point did the court indicate that a motion to quash would be granted." The record certainly does not compel the opposite conclusion.

By its plain terms, Judge Nadler's CMC order imposed a *deadline* on *plaintiffs* to take defendants' default; it did not grant *permission* or provide a safe harbor for

---

**[10]** The record shows she possessed the ability to research the relevant litigation rules, and follow them successfully, to obtain affirmative relief in her favor on many occasions. This included her successful motion in this case to expunge the lis pendens; multiple successful motions she filed in the breach of contract case against McClain and Harrell (motions to have requests for admissions deemed admitted, for summary adjudication and to dismiss the appeal as premature); and a successful petition for a writ of execution in the unlawful detainer case she also filed against them.

21

*defendants* to *further* delay filing an answer or motion to quash. Given that defendants were well aware of the complaint and had failed to respond to it, and that at the time of the CMC their response was long overdue, the order could not reasonably be interpreted to grant *defendants* more time to settle the pleadings. Defendants' new counsel, who appeared and argued at the final hearing, admitted the order did not "preclude Plaintiffs herein from seeking to enter Defendants' defaults prior to [the] July 22 [deadline], which in fact they did." In fact, McClain and Harrell could have and should have taken defendants' default at any time after February 20, 2016, the thirty-first day after they served the complaint on defendants. Judge Nadler chastised plaintiffs at the June 16, 2016 CMC for not having taken defendants' default much earlier, which violated the Rules of Court. Rule 3.110(g) required them to request entry of default within 10 days after the time for service had elapsed. Since, as defendants' counsel admitted, plaintiffs were free to take the defendants' default at any time, it necessarily follows that defendants were not free to wait until July 22, 2016, to answer.

Further, Kissler's claimed "misunder[standing]," even if it had been genuine, rested on the same ignorance of the basic rules we have already discussed—including that defendants were required to respond to the complaint within 30 days of service; if they did not do so plaintiffs could take their default; and defendants had waived jurisdictional defects by participating in the case without having first moved to quash service. No litigant who had bothered to apprise him or herself of these very basic litigation rules would have believed defendants' prior, ongoing and continued failure to respond to the complaint five or six months into the case did not expose them to the risk of a default or interpreted Judge Nadler's order as conferring permission on defendants to continue to sit on their hands for another 37 days.[11]

---

[11] Our dissenting colleague faults our analysis, with the exclamation "Rules. Rules. Rules. The issue here is not about rules." (Dis. opn. at p. 25.) We disagree. Kissler's claimed interpretation of the order, besides its inconsistency with the trial court's language, makes even less sense in light of basic rules of procedure that any competent attorney would understand. Further, defendants themselves relied on their

22

The actual transcript of the CMC hearing, which we have already quoted at some length, underscores that defendants' claimed interpretation was not only unreasonable but also totally implausible. It is not clear whether the parties provided Judge Ottenweller with a transcript of that hearing before he ruled on the motion for relief from default. Even if they did not, Judge Nadler—on whose findings and tentative rejection of defendants' motion for relief from judgment Judge Ottenweller may well have relied—personally knew what had transpired at that CMC and rejected defendants' claim of mistake.[12] Defendants have not shown Judge Ottenweller acted arbitrarily in reaching the same conclusion.

In coming to a different view of this record, our dissenting colleague improperly substitutes his findings and credibility assessments for those of the trial court and reaches issues neither party has raised on appeal. He characterizes Judge Nadler's June 2016 CMC order as "confusing" and points out that Judge Ottenweller was new to (implying he was unfamiliar with) the case.[13] (Dis. opn. at pp. 11, 13 ["apparently his first entry

---

mistaken beliefs about these very rules as bases for their assertion of excusable neglect. This case *is* about rules, namely, the basic procedures that the Legislature and courts have adopted to ensure fair and orderly trial court proceedings. And it is about trial courts' ability to enforce those rules and run their courtrooms in a fair and efficient way so that *all* those who seek access to the courts will have it. As our high court stated, treating those who ignore the rules of civil procedure with lenience under section 473 (even pro per litigants) would "lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation." (*Rappleyea*, *supra*, 8 Cal.4th at p. 985.)

[12] In his findings of fact, Judge Nadler faulted Kissler for doing "nothing until after Plaintiffs had already filed their default," "*despite* discussing the issue with Plaintiffs and the court at the June 16, 2016 Case Management Conference (at which time *this court informed the parties that Plaintiffs had until July 22, 2016 to seek Defendant[s'] default and that Defendants needed either to file an answer or bring a motion to challenge service of the summons and complaint*)." Judge Nadler's view of what had transpired in his courtroom was that he had given defendants ample warning that persisting in their failure to respond to the complaint would subject them to a default.

[13] To the extent the dissent means to imply that Judge Ottenweller was unfamiliar with the case when he denied defendants' motion, such implication is refuted by the record. After the case was reassigned from Judge Nadler to Judge Ottenweller in

23

into the matter"].)  In substituting his own finding that the order was "[c]ertainly . . . unclear," "confusing," "ambiguous" or "vague" and "obviously . . . subject to interpretation" (*id.* at p. 25), Justice Richman oversteps an appellate court's role.  (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court"]; *Iott*, *supra*, 206 Cal.App.3d at p. 527 [" 'The question to be determined by the appellate court is not what it would have done had it been sitting in the place of the trial judge, but whether from the record it can be said that the trial judge failed to act wisely, reasonably and fairly in view of what was presented to him in support of the application.  If such failure does not clearly and unmistakably appear, it cannot be said that the trial judge abused his discretion, and his decision should be affirmed' "].)  "In considering whether a mistake of law furnishes grounds for relief, ' "the determining factors are the reasonableness of the misconception and the justifiability of lack of determination of the correct law." ' " (*Hopkins & Carley v. Gens* (2011) 200 Cal.App.4th 1401, 1413.)  Whether a mistake is excusable is a fact question as are the determining factors of "the reasonableness of the misconception and the justifiability of lack of determination of the correct law." (*City of Ontario v. Superior Court*, *supra*, 2 Cal. 3d at p. 346.)  Even if "contrary findings *could* have been made, an

<hr />

November 2016, Judge Ottenweller presided over this case for a five-month period, during which, as his order reflects, he familiarized himself with the case history, allowed the parties multiple opportunities to file additional briefs and declarations, continued the hearing to allow them to bring in new counsel, and addressed the various new issues and arguments defendants raised.  Judge Ottenweller's order reflects that he had familiarized himself with what had transpired in this case well as the Kissler case.  And he held three hearings in this case alone, and perhaps held some in the *Kissler* case as well.  Judge Ottenweller was thus in far better position than our colleague to assess whether Kissler's claimed misunderstanding was reasonable.

appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict." (*Shamblin*, at p. 479.)[14]

The dissent then poses a rhetorical "challenge" to "set forth precisely when it was that Kissler had to act prior to the July 22 default date." (Dis. opn. at p. 25.) The answer is not difficult: *immediately*. At minimum, very, very promptly. Judge Nadler had pointed out that plaintiffs could and should have taken defendants' default already because defendants' response to the complaint was long overdue. Any minimally competent lawyer would have filed an answer within a day or two, at most. Indeed, plaintiffs *could* have filed their request for default immediately after the case management conference but instead gave defendants another 13 days.[15] Certainly competent counsel would have responded to the complaint well before then. Both trial judges found defendants' conduct, far from excusable, was knowing and deliberate, that is, not a mistake at all.

Our dissenting colleague also zeroes in on defendants' contention that the default judgment against Kissler was unjust, because in her parallel suit against plaintiffs the

---

[14] Our colleague subjects these experienced and well-regarded trial judges to numerous criticisms, faulting Judge Ottenweller for not quoting Judge Nadler's CMC order in full, for example (Dis. opn. at p. 23), and Judge Nadler for ruling on the motion to quash portion of defendants' joint motion to quash and for relief from default while the default was still in place. (*Id.* at pp. 11–13.) The criticisms are uncalled for and irrelevant to the issues on appeal.

[15] Our dissenting colleague next takes aim at plaintiffs, citing an ethical rule requiring attorneys to provide warning to their adversaries before taking a default. (Dis. opn. at pp. 26–27.) This argument, nowhere raised by defendants, has no merit. First, plaintiffs were pro per litigants, not attorneys, and are not bound by the Rules of Professional Conduct the dissent refers to, and as he concedes the law requires no such warning. (Dis. opn. at p. 26, fn. 9.) The dissent's suggestion in a footnote that pro per litigants are bound by the ethical rules governing attorneys (Dis. opn. at p. 27, fn. 10) is novel. We are aware of no case or other authority that supports such a rule, the implications of which would be breathtaking. Holding pro per litigants to procedural rules governing courts is a far cry from subjecting them to the Rules of Professional Conduct governing attorneys. Second, the idea that defendants had no warning of an impending request for default flies in the face of this record, given Judge Nadler's comments at the June 16, 2016 CMC.

25

court granted her summary adjudication holding she was not a party to the contract. (See Dis. opn. at pp. 5–6, 16-17.) However, the issue of Kissler's status as a party, while the subject of deemed admissions she succeeded in obtaining in her suit against McClain and Harrell, is murky, at best, because even in her own lawsuit Kissler engaged in a complete about-face on that issue. In her complaint against McClain and Harrell, she personally sued them for breach of the very same contract to which she subsequently claimed she was not a party, and in that case she denied she was a party only *after* they took her default in *this* case. The dissent fails to explain why the post hoc deemed admission and resulting summary adjudication that Kissler was not a party to the very contract on which she had sued plaintiffs for breach should trump the earlier filed default against her in this case. Further, if there is any risk of inconsistent judgments here, that is not reason to jettison the law governing section 473(b) and force plaintiffs and the court to countenance the defendants' persistent disregard of applicable rules, deadlines and procedure. That would ensure they can benefit from what was in effect a default on plaintiffs' part (in failing to respond timely to requests for admission) while avoiding the consequences of their own default in this case. If the defendants' tactics in this case result in adverse, conflicting results between multiple cases it is a fate defendants have inflicted on themselves. Our job is not to square circles but to correct legal error where error is demonstrated and to faithfully apply the law.

Finally, our dissenting colleague faults Judge Ottenweller for failing to act as a "gatekeeper" in entering the default judgment against Alternatives because, the dissent claims, "Alternatives is nowhere mentioned in [plaintiffs'] breach of contract claim." (Dis. opn. at pp. 30–32.) Again, no party has raised this issue as a basis for reversing the judgment, and we would not reach out to decide it. Were we to do so, however, we would not agree with our colleague's reading of the record. The details are tangential and we set them out in a footnote.[16]

---

[16] Plaintiffs, in their amended complaint, alleged that the complaint was brought against "Karen Kissler, individually and *dba* Karen Kissler, Esq. and Alternatives, A

In short, our dissenting colleague disregards the limited nature of our review under an abuse of discretion standard. Although he acknowledges that standard, he fails to apply it properly. His analysis second-guesses the trial court's determinations about credibility and the weight of the evidence and substitutes his own judgment for that of the trial judges as to whether defendants' continued failure to respond to the complaint, despite the trial court's warning, was reasonable. Nothing in any authority cited by the dissent, including the Supreme Court's opinion in *Rappleyea*, supports that approach.

In engaging in what is effectively de novo review of the trial court's ruling, our colleague's analysis renders relief from default mandatory in virtually every case, for we can see no limits to the dissent's reasoning or envision any realistic scenario in which relief would not be available to litigants such as these who sat on their rights—knowingly—so persistently, and for so long. Our colleague justifies doing so by focusing solely on one of the purposes of the statute—that of affording parties their day in court to try cases on their merits. But he ignores other important policies underlying the statute. These include the trial courts' ability to enforce the Code of Civil Procedure and the Rules of Court, which are designed to ensure a fair, orderly and efficient process. As one appellate court put it thirty years ago, "Certainly it is true that a policy of the law favors deciding cases on their merits, *but other policies favor getting cases to trial on time, avoiding unnecessary and prejudicial delay, and preventing litigants from playing fast*

---

Health Collective." (Italics added.) References to Kissler in the complaint, including in the breach of contract action, should be read in light of this initial definition of the parties. Thus, in alleging that Kissler employed plaintiffs to grow marijuana plants and agreed to pay a certain price, that "[d]efendant's agents came to [the property, owned by Kissler, where the marijuana was being grown] without notice to Plaintiffs where they cut down and removed 99 marijuana plants," that plaintiffs were paid far less than promised, and that when they asked Kissler when she would pay she told them their claims were "ridiculous," the complaint reasonably must be understood to refer to that Kissler individually and Kissler doing business as Karen Kissler, Esq. and Kissler doing business as Alternatives. We infer that Judge Ottenweller read the complaint as it logically should be read, since he found Alternatives and Kissler were in essence "one and the same."

*and loose with the pertinent legal rules and procedures.*" (*Gardner v. Superior Court* (1986) 182 Cal.App.3d 335, 339, italics added.)

When a default is the result of one party flouting these rules or failing to exercise diligence to ascertain what the law requires of them, trial courts are not required to, and indeed should not, grant that party relief from default. As the California benchbook states, "[w]hen the court finds the alleged mistake of law is the result of professional incompetence based upon erroneous advice, general ignorance of the law, lack of knowledge of the rules, unjustifiable negligence in the discovery or research of the law, laxness or indifference, relief will normally be denied." (Cal. Civ. Ctrm. Hbook. & Desktop Ref. § 19:40 (2019 ed.).)

Countenancing a litigant's blatant disregard of the judicial process and rules has serious downsides. It invites other litigants to ignore the laws and rules and renders the process unfair to most other litigants and counsel who endeavor to comply with them. It also undermines trial courts' ability to manage their caseloads and, in turn, to serve other litigants in a timely way. To grant relief to litigants, like defendants here, who flout the relevant statutes and rules and delay cases in getting to trial, as our sister court explained, would " 'permit the courts to become a sanctuary for chronic procrastination and irresponsibility on the part of either litigants or their attorneys.' [Citation.] It would also thwart vital 'policies [which] favor getting cases to trial on time, avoiding unnecessary and prejudicial delay, and preventing litigants from playing fast and loose with the pertinent legal rules and procedures.' [Citation.] 'When inexcusable neglect is condoned even tacitly by the courts, they themselves unwittingly become instruments undermining the orderly process of the law.' " (*Iott*, *supra*, 206 Cal.App.3d at p. 531.)

The trial court in this case properly declined to go down that path. Its ruling was well within the bounds of discretion the law affords it, and we unhesitatingly affirm.

## II.

### *The Trial Court Did Not Err in Denying Mandatory Relief from Default to One of the Defendants Under Section 473(b).*

The health collective, Alternatives, also contends the trial court erred in denying its request for mandatory relief under section 473(b) on the ground that its attorney, Kissler, filed an affidavit of fault. The mandatory part of that section states, in relevant part, "Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, or (2) resulting default judgment or dismissal entered against his or her client, unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect. The court shall, whenever relief is granted based on an attorney's affidavit of fault, direct the attorney to pay reasonable compensatory legal fees and costs to opposing counsel or parties." This provision, which applies only to default judgments and dismissals, was intended " 'to alleviate the hardship on parties who *lose their day in court* due solely to an inexcusable failure to act on the part of their attorneys.' " (*Zamora*, *supra*, 28 Cal.4th at p. 257.)

In the trial court and on appeal, defendants relied on *Gutierrez v. G&M Oil Co., Inc.* (2010) 184 Cal.App.4th 551 (*Gutierrez*), in which our colleagues in the Fourth District held section 473, subdivision (a) applied to a mistake made by the corporate defendant's in-house attorney. The trial court found *Gutierrez* inapposite, noting "Gutierrez was employed as house counsel and vice president of a corporation which included a board of directors and other officers who ran a gas station chain. It was clear he was acting as a lawyer for the corporation. Here, there is no distinction between Ms. Kissler and Alternatives. She founded, established and is its CEO, Secretary and CFO. There are no other corporate officers. She reports only to herself. [¶] In this action, the decisions and errors of the attorney, Kissler, are also clearly one and the same as those of

the client because Kissler was also the owner and CEO of Alternatives, making the decision in both that capacity and as the attorney. Relief is not mandatory based on an attorney affidavit of fault where the fault is also that of the party. See *Todd v. Thrifty Corp.* (1995) 34 Cal.App.4th 986, 991; *Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1248."

The issue defendants raise is partly one of fact, to which the substantial evidence standard of review applies, and partly one of law to which we apply de novo review. (See *Carmel, Ltd. v. Tavoussi* (2009) 175 Cal.App.4th 393, 399 [to extent application of mandatory relief provision does not turn on disputed facts, it is subject to de novo review; where facts are in dispute, substantial evidence rule applies to trial court findings].) As to the factual issue, defendants challenge the trial court's finding that "there is no distinction between Ms. Kissler and Alternatives." Defendants do not dispute, and Kissler admitted in her declaration, that she incorporated Alternatives, serves at its CEO, Secretary and CFO and "sit[s] on [its] board of directors as its sole officer and director." However, they point to other facts set forth in Kissler's declaration, including that Alternatives was incorporated as a Nonprofit Mutual Benefit Corporation under the Corporations Code and, she claims, has "over 21,000 members" who she describes as "akin to shareholders" and that "although, like any nonprofit, it pays salaries, overhead expenses, etc." it "turns any net profits back into the corporation for the benefit of its members." And we note that her declaration attached Alternative's articles of incorporation and bylaws that provide further support for some of these assertions.

Plaintiffs, on the other hand, assert that "Alternatives is a 'dba' of appellant [defendant] Kissler, not a separate legal entity" but cite nothing in the record supporting that assertion. They contend the court's determination that there is no distinction between Kissler and Alternatives is a "factual issue which was resolved by the trial court judge based on the evidence submitted to him by appellants." The register of actions reflects that plaintiffs submitted declarations in opposition to defendants' motions for relief from default. However, defendants failed to include those declarations in the record. That failure precludes us from determining whether substantial evidence supports

30

the trial court's findings.  On review for sufficiency of evidence, we must consider all the evidence and view it in the light most favorable to the prevailing party.  (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.)  Our authority "*begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination."  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874.)  Without a complete record that includes the evidence submitted by *both* parties, we could not say the evidence is insufficient to support the trial court's finding that Alternatives and Kissler were one and the same.  (*In re Silva* (1931) 213 Cal. 446, 448.)

Even if we considered the issue despite defendants' omission of plaintiffs' evidence from the record, much of the evidence submitted by defendants themselves supports the trial court's finding.  As we have said, Kissler admitted that she incorporated Alternatives, serves as its CEO, Secretary and CFO and "sit[s] on [its] board of directors as its sole officer and director."  Moreover, in her disputes with plaintiffs, Kissler treated the entity as separate or the same, depending on what suited her.  Thus, the contract she drafted and sent to plaintiffs listed Alternatives as the party and referred to herself as its "Director," but when she sued plaintiffs for breach of that very same contract, she sued in her *own name* and in the name of her consulting firm dba, but not in the name of Alternatives.  When her default had been taken in the case plaintiffs filed against her, she pivoted and took the position that it was Alternatives who made the contract with plaintiffs, not her individually.  Finally, when she was sued along with Alternatives in this action, she chose to represent herself and Alternatives both, rather than obtaining separate counsel for the entity.  All of these facts indicate Kissler controlled Alternatives, using the entity as she pleased, as either indistinguishable from herself or as distinct, depending on what suited her.  This is substantial evidence supporting the trial court's finding that there was no attorney-client relationship between her and Alternatives because they were one and the same.

We next turn to defendants' legal challenge to the trial court's ruling.  Defendants contend the trial court's determination that they were not entitled to the mandatory relief

31

provision of section 473(b) rested in part on the court's conclusion that "[r]elief is not mandatory based on an attorney affidavit of fault where the fault is also that of the party." Defendants point out that the cases the trial court cited—*Lang v. Hochman* and *Todd v. Thrifty Corp.*—are not controlling and urge us to apply our prior decision in *Benedict v. Danner Press* (2001) 87 Cal.App.4th 923.

We need not address these cases or the issue on which they differ, which concerns the relevance, in applying the mandatory relief prong of section 473(b), of clients' mistakes that contributed to causing the default. (See *Gutierrez*, *supra*, 184 Cal.App.4th at pp. 557–558 [discussing split of authority].) In each of these cases, the attorney was distinct from the client, whereas here the trial court found the two were "one and the same."[17]

To decide whether the mandatory relief provision in the statute applies in this situation, when an attorney is in essence representing herself, we begin with the statutory language. The mandatory relief prong of section 473(b) refers to "an *attorney's* sworn affidavit attesting to *his or her mistake*, [etc.]" and a "resulting default" or "*default judgment*" entered "*against his or her client*." (Italics added.) By its terms, the statute distinguishes between the attorney and the client and presupposes they are not "one and the same." The statutory language thus fails to support defendants' position.

The statutory purposes also suggest no reason for its application here. "The purpose [of the 1988 amendment adding the mandatory relief provision] was threefold: to relieve the innocent client of the consequences of the attorney's fault; to place the burden on counsel; and to discourage additional litigation in the form of malpractice actions by the defaulted client against the errant attorney." (*Solv-All v. Superior Court*, *supra*, 131 Cal.App.4th at p. 1009, fn. omitted.) If the attorney and client had no separate

---

[17] For this reason our dissenting colleague's reliance on these and similar cases is also misplaced. Our colleague disagrees with the trial court's factual finding that Kissler and Alternatives were one and the same by ignoring the evidence supporting the trial court's finding, characterizing the contrary evidence as "undisputed" and ignoring the prerogative of the trial court to reject Kissler's assertions on credibility grounds. (Dis. opn. at pp. 28–29.)

32

existence, there is no "innocent client" to protect; rather, the error that caused the default is that of both the attorney and the client, acting inextricably together. Placing the burden on counsel protects counsel and the client both, since they are indistinguishable. Granting relief to an attorney who represents an entity she completely controls would undermine the rule affording discretionary relief only from excusable mistakes and allow attorneys who represent themselves a benefit other self-represented clients do not receive.[18] It would be particularly inappropriate here, where the trial court found that "the history of Defendants' conduct, which resulted in the default being possible, makes it glaringly clear that for months Defendants knowingly failed to answer or file other appropriate challenge to the pleading or service despite not only knowing of the action, but actually taking part in it." Nor is the malpractice prevention purpose served by application of the mandatory relief provision in this circumstance. There is no risk of an attorney suing herself for malpractice.

Notably, defendants cite a case that is on point. In *Esther B. v. City of Los Angeles* (2008) 158 Cal.App.4th 1093, the court rejected a request for relief from dismissal of a motion made by a self-represented attorney. (*Id.* at p. 1099.) The court found the plain language of the statute did not support such relief, observing, "Under the plain language of the statute, the mandatory relief provision only applies in the case of an 'attorney' representing a 'client.' Our interpretation is further supported by comparing the mandatory relief provision with the discretionary relief provision of the same subdivision. The latter provides that the court may set aside a default or dismissal on the motion of 'a party or his or her legal representative.' Thus the discretionary provision applies to a party, including a party appearing in propria persona, and an attorney representing a

---

**18** In seeking discretionary relief, clients who represent themselves are held to the same standard of excusable neglect as litigants who are represented by counsel. (See *Hopkins & Carley v. Gens*, *supra*, 200 Cal.App.4th at pp. 1413–1414.) It would be anomalous to treat pro per litigants *less* favorably than self-represented attorneys by affording the latter, but not the former, mandatory relief from defaults caused by their own inexcusable neglect. Defendants' proposed interpretation of the mandatory relief provision, if accepted, would have that effect.

33

party, whereas the mandatory provision only applies to an attorney representing a party." (*Id*. at pp. 1099–1100.) *Esther B.* also recognized that "[g]ranting mandatory relief to parties appearing in pro per, even if they are attorneys, would not serve any of the purposes of the legislation.  In these situations the 'client' is not innocent, there is no one to whom the blame can be shifted and there is no risk of a malpractice action because the client would have to sue herself."  (*Id*. at p. 1100.)

The trial court's determination in this case that Kissler and Alternatives were "one and the same" in effect means Alternatives was self-represented.  *Esther B.* is thus on all fours and supports the trial court's decision here.

For all of the foregoing reasons, defendants have failed to meet their burden to show the trial court erred in denying relief to defendant Alternatives under the mandatory relief provision of section 473(b).

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

_____
STEWART, J.


I concur.


_____
KLINE, P.J.


*McClain v. Kissler* (A152352)

I respectfully dissent.

Over the years our Supreme Court has set forth the principles to be applied by a court reviewing appeals involving motions for relief from default. Perhaps the three most significant are these:

(1) " '[T]he policy of the law is to have every litigated case tried upon its merits, and it looks with disfavor upon a party, who, regardless of the merits of the case, attempts to take advantage of the mistake, surprise, inadvertence, or neglect of his adversary.' " (*Au-Yang v. Barton* (1999) 21 Cal.4th 958, 963.)

(2) "Because the law favors disposing of cases on their merits, 'any doubts in applying Code of Civil Procedure section 473 must be resolved in favor of the party seeking relief from default [citations]. Therefore, a trial court order denying relief is scrutinized more carefully than an order permitting trial on the merits.' " (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980.)

(3) " '[V]ery slight evidence will be required to justify a court in setting aside the default.' " (*Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233) and "[u]nless inexcusable neglect is clear, the policy favoring trial on the merits prevails." (*Id.*, at p. 235.)

These principles, not to mention the cases applying them, are ignored by the majority here, which goes out of its way to affirm, and thus keep in place the default judgment for plaintiffs Linda McClain and Jonothan Harrell on their one-count complaint for breach of contract against two defendants—one of whom, Karen Kissler, had received a ruling that she could not be liable on the contract, the other, Alternatives, Inc., against which no cause of action was even alleged! And in its effort to affirm that judgment, the majority misstates the pleadings below, misstates the record here, and, indeed, ventures so far from the proper approach that it makes an argument that was not even made by the plaintiffs.

1

All this is bad enough in any case, but it is particularly egregious here, as it is *the third case* involving Kissler and McClain and Harrell arising out of their cannabis-growing relationship, in both of which earlier cases McClain and Harrell *lost*, three Sonoma County judges having ruled against them. No matter, says the majority. And also no matter that in this very case Kissler was fighting McClain and Harrell every step of the way, manifest by what I would wager is the longest register of actions in the history of California jurisprudence for a case involving a default for failing to answer a complaint—19 pages! Kissler was, in the words of the superior court, a "very active" participant in this case.

Despite all that, the majority affirms the order of a fourth Sonoma County judge denying relief from the default, a judge who, as best as I can tell, had absolutely nothing to do with this case—or either of the others—until after the default was entered. The majority affirms that ruling, the upshot of which is there are now conflicting judgments in Sonoma County, the first one saying Kissler could not be liable, the other, the default here, saying she is liable for $159,300—not to mention a default judgment against a defendant against which no claim was even alleged. The effect of all this is to "defeat, rather than to advance the ends of justice." (*Mitchell v. California & Oregon Coast S.S. Co.* (1909) 156 Cal. 576, 580.) I cannot be a party to it. And I dissent.

## BACKGROUND

### The Underlying Facts—All the Facts

On June 23, 2015, McClain and Harrell entered into an "Agreement to Grow!" cannabis (growing agreement). The agreement was short, three paragraphs, and provided in pertinent part as follows:

"This agreement is between Katie McClain and Jon[o]than Harrell and Alternatives, a Health Collective (by Director, Karen Kissler.)

"Katie and Jon[o]than agree to grow beautiful medical marijuana at the farm (23000 Pocket Ranch Rd., Geyserville) for Alternatives (which owns the plants[)]. This

2

includes planting, growing, harvesting and hanging plants to dry. Katie and Jon[o]than will also provide security for the medicine by living at the farm as much as possible during the growing and trimming season (except when Karen and family are staying there) including supervising trimmers if trimming is done at the farm. . . . [Katie] and Jon[o]than are to receive $250 per pound of finished, trimmed weight. Alternatives is to receive all excess, untrimmed plant matter. Additionally, should she choose to help trim as well, she may receive compensation for that as well ($150/lb). In addition, Katie and Jon[o]than are to receive advance payments as a credit against their final compensation received in the amount of $500 per week beginning June 15, 2015.

"Katie and Jon[o]than are medical marijuana patients registered as members of Alternatives, a Health Collective. Their labor is in compliance with all relevant California Health and Safety codes and interpretive case law."

McClain and Harrell both signed the agreement on June 23.[1]

It would develop that McClain and Harrell were to be paid $350 per pound, were provided an off-road vehicle, and were allowed to live on the Geyserville ranch; and Harrell was also advanced some $14,000 for growing and construction materials.

Referring to the growing agreement, by e-mail early in the morning on September 11, Kissler wrote to McClain as follows:

"Drying will be done at the club (we'll use the drying and clone rooms.)

"When the Geyserville harvest is complete, or on Oct. 31st, whichever is earlier, you won't live at the ranch anymore. The ranch will be left clean. All pots will be emptied and the dirt put in 3 piles near each grow area. All refuse (and visible dog poop) will be removed from the property and the house will be left clean. All animals will be removed. No locks will be changed. (We'll be spending the holidays there.) If you

---

[1] Around July 1, a second agreement was apparently entered into to grow cannabis in Guernville. As best as I can tell, this agreement is not involved.

3

anticipate needing to stay longer, let me know now. Of course, if all goes well, we can continue (then negotiate a new agreement.)

"No one is to live or work at either location without my consent. I'll let you know the day before when I'll be coming to either property."

Less than an hour later, McClain wrote back:

"Jonothan and I will trim what we can and it will only be a small fraction. I agree on most of what you are asking except emptying the grow bags. You will need to rent a tractor it is really heavy and difficult to do. I had 2 laborers for 3 days emptying 20 or 30 of them. You will need to rent a covered trailer for transportation or [U]haul.

The harvest was complete by mid-October. But McClain and Harrell refused to vacate the ranch, leading to the first lawsuit here—for unlawful detainer.

**The Unlawful Detainer Action**

An unlawful detainer action was filed against McClain and Harrell, the pleadings of which are not in the record. McClain and Harrell resisted it, and the unlawful detainer case went to trial on November 25, before the Honorable Kenneth Gnoss. Judge Gnoss ruled against McClain and Harrell, and issued a writ of possession to take effect forthwith.

Plaintiffs in the unlawful detainer action reserved the right to claim McClain and Harrell pay rent for the Geyserville property from October 15, 2015 until they vacated it, as well as any property damage related to their unpermitted residency. Plaintiffs also reserved the right to claim compensation for all damage consequential to their breach of the growing agreement. And thus came lawsuit number two against McClain and Harrell, Action No. 258091.

**Action No. 258091**

On November 30, 2015, action No. 258091 was filed in Sonoma County. The plaintiffs were "Karen Kissler, Karen Kissler Management Consulting," the complaint alleging that "Karen Kissler Management Consulting (Management) is the duly

4

authorized agent for Alternatives, a Health Collective, a California mutual benefit nonprofit corporation." Defendants were McClain (sued as Katie McClain Mengali) and Harrell. Action No. 258091 alleged two causes of action, for breach of contract and breach of implied contract/constructive trust. The breach of contract cause of action alleged that on June 23, 2015, "Management, McClain and Harrell" entered into a contract, discussed above. And it went on, the majority of cannabis grown at the Geyserville ranch had severe high levels of contaminants, which was particularly problematic as the cannabis was to be grown for the most vulnerable: patients under doctors' care for cancer, asthma, and many more illnesses. The fundamental basis of the claim was that McClain and Harrell grew toxic, infected cannabis plants that lab results showed contained a cocktail of pesticides that were carcinogens, relying in part on an October 30, 2015 lab test that revealed that the cannabis McClain and Harrell grew suffered "severe powdery mildew, Cladosporium, myclobutanil and permethrin."[2] And the lab report concluded, "Due to the mold and fungus contamination detected, this cannabis may not be recommended for patient use."

---

[2] As described by Kissler:

"a. Powdery Mildew is a pathogenic fungal disease. Smoking mildew can lead to respiratory infections or aspergillosis, a lung disease for which there is no cure. If someone with a compromised immune system smokes moldy or mildewed cannabis, the resulting infection could kill them.

"b. Cladosporium is a toxic fungus that is known to cause skin, eye, sinus, and brain infections. It is associated with allergies and asthma. It was identified as a pathogen in a multistate outbreak of fungal meningitis.

"c. Myclobutanil: Exposure to the pesticide myclobutanil is known to cause skin rash, allergic dermatitis, itchiness, nausea, hea[d]ache, diarrhea, abdominal pain, vomiting, nosebleed, and eye irritation.

"d. Permethrin: If people eat the pesticide permethrin it could cause sore throat, abdominal pain, nausea and vomiting. People that have breathed in permethrin have had irritation in the nose and lungs, difficulty breathing, headaches, dizziness, nausea and vomiting. The EPA decided that permethrin was 'likely to be carcinogenic to humans' if it was eaten."

5

Action No. 258091 was apparently pursued vigorously in 2016, including requests for admissions propounded by plaintiff. Following a motion by plaintiff, on December 14, 2016, the Honorable Arnold Rosenfeld ordered the requests deemed admitted, providing in a minute order that "Defendants have admitted that Plaintiff was not an individual party to the contract at issue in this matter." The effect of Judge Rosenfeld's ruling would lead to a motion for summary adjudication, which motion was decided by the Honorable Bradford Demeo who, on March 8, 2017, ruled that "Plaintiff's motion for summary adjudication is granted," holding as follows:

"[T]here are no triable issues as to any liability or exposure with respect to Plaintiff Karen Kissler (hereafter 'Kissler') individually or as an attorney herein. . . . [¶]

"Plaintiff's motion for an order adjudicating Plaintiff Karen Kissler, individually, on the ground that she was not a party to the subject agreement in this action is GRANTED. Further, Kissler's motion for an order adjudicating that she was not a party to this subject agreement in her capacity as a licensed California attorney is also GRANTED."

While all that was occurring in action No. 258091, McClain and Harrell filed their own lawsuit, action No. 258139.

**Action No. 258139**

On December 10, 2015, represented by attorney Thomas Byrne, McClain and Harrell filed a complaint naming three defendants: "Karen Kissler, individually and dba Karen Kissler, Esq. and Alternatives, a Health Collective." Action No. 258139 alleged one cause of action, for breach of contract, which claim alleged that on June 22 a "written agreement" was made "between Katie McClain, Jonothan Harrell and Karen Kissler," alleging that the agreement was "as follows: Karen Kissler would employ Plaintiffs to

6

raise 99 medical marijuana plants" at Geyserville. Action No. 258139 sought $144,500 in damages.[3] No claim was asserted against Alternatives.[4]

On January 6, 2016, attorney Byrne filed a first amended complaint, seeking the same $144,500. As best I can tell, the only significant difference between it and the original complaint was this additional allegation in paragraph BC-6: "On 10/23/2015, plaintiff's attorney met with defendant Karen Kissler and asked her when she was going to pay plaintiffs the amount claimed as described above. She stated their claims were 'ridiculous.' On or about 12/15/ 2015, defendant listed her property at 18241 Neeley Rd., Guerneville, CA for sale. Defendant's actions were in violation of [Civil Code section] 3439.04 . . . ."

On December 14, McClain and Harrell filed a notice of pending action (lis pendens).

---

[3] While it is not an issue even alluded to by anyone, not by the parties, not by any of the judges, I am at a loss to understand how McClain and Harrell's complaint did not implicate the compulsory cross-complaint rule in Code of Civil Procedure, section 426.30, subdivision (a): "Except as otherwise provided by statute, if a party against whom a complaint has been filed and served fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has against the plaintiff, such party may not thereafter in any other action assert against the plaintiff the related cause of action not pleaded."

[4] One example of the majority's misstatement of the pleadings, perhaps the most egregious one, involves this fact, as to which the majority describes action No. 258139 this way: "In December 2015, plaintiffs sued Kissler, individually and doing business as 'Karen Kissler, Esq.' and 'Alternatives.' We refer to Kissler and her Esq. and Alternatives dbas as 'defendants.' Plaintiffs alleged Kissler breached a contract in which she retained them to raise marijuana plants at a property in Geyserville agreeing to pay them for raising and trimming the plants. Instead of paying for the plants as agreed, plaintiffs alleged defendants' agents came to the property without notice, removed all the plants and the equipment used to grow them and paid only $14,000 of the $158,500 *they* had promised to pay." (Maj. opn., p. 5., emphasis added.) The facts are that the contract is expressly alleged to be with "Karen Kissler," and all references on the breach of contract form are to defendant singular, not plural.

7

On December 28, 2015, Kissler filed a motion to expunge lis pendens, McClain and Harrell filed opposition, and Kissler a reply.

On February 5, attorney Byrne substituted out, and McClain and Harrell were now representing themselves.

On February 10, the motion to expunge came on calendar. There was no appearance by either side, and that day the Honorable Gary Nadler entered an order granting the motion.

A case management conference was scheduled for April 7, on which day Kissler filed a "Declaration re Lack of Service." A case management conference was held that afternoon, the minutes of which include the following:

"The Court finds notice to appear has been issued and served by mail.

"There being no opposition, Court adopts its previously published tentative ruling as follows:

"Required to appear.

"///

"Plaintiffs KATIE MCLAIN and JONOTHAN HARRELL, self-represented parties are present.

"Defendant is not present.

"Court and parties discuss issues.

"Upon conclusion of discussion, the Court orders as follows:

"CLERK IS DIRECTED TO ISSUE AN ORDER TO SHOW CAUSE as to DEFENDANT KAREN KISSLER.

"ORDER TO SHOW CAUSE (TCDR) – 6/16/2016 at 3:30pm S17 . . . ."

That gets us to June 16.

On June 16, the matter came on before Judge Nadler, for what the minutes reflect was an order to show cause. And the minutes also reflect, McClain and Harrell, "self-

8

represented parties are present," and "Counsel Karen Kissler is present on behalf of Defendant Karen Kissler ind. [*sic*] And dba Karen Kissler Esq. specially appearing."

There is a brief, three-and-one-half page transcript of that hearing. It reveals the following colloquy after Kissler represented she was "specially appearing":

"THE COURT: That's what sort of gets me here.

"MS. KISSLER: There was an attempt at subserve and wasn't completed. And there is a co-defendant named that has not been served.

"THE COURT: Okay. So the proof of service was Alternatives Health Collective, and that was due on March 9th, 2016. Proof of service filed as to Ms. Kissler, no default taken.

"Apparently Ms. Kissler was arguing she was not properly served. I don't know whether that is true. I'm not going to determine that today, but either we get an answer from Ms. Kissler, or you take a default on this case. And if not, I will be considering sanctions on that. Is this case different than what I just called?

"MS. McCLAIN: Yes, it is.

"THE COURT: So what I'm going to do is, since I don't have an answer from Ms. Kissler, I'm speaking to you now. I'm going to order that either you file a proof of service. I guess you already have. You may want to find out why Ms. Kissler—why she thinks she's not been properly served. That's up to you. If you don't want to speak to her, that's fine. But I will give you 30 days from today's date to file a default. I will give you an exact date so we're clear on that.

"Make that July 22nd, 2016. Again, that's the last date to which you may get a default entered in this matter.

"Ms. Kissler, I assume you filed some sort of motion to quash. That's for you folks to figure out. And if it comes before my desk, then I will handle it.

"I'm going to give this one more date for an order to show cause. And what I mean by that is this: You have an obligation to either get it served, and if you get it

9

served and the default is taken—and you're well beyond what is required in the California Rules of Court time-wise to have taken care of this matter. Again, if you feel that service was proper, then you take the default. You have the time limit I've given you as you're outside time limits. If you fail to comply with that, then unless there is good cause, then I will consider imposing sanctions in this case, failure to comply with California Rules of Court. So one more order to show cause.[5]

"MS. McCLAIN: Could I ask a question?

"THE COURT: You can.

"MS. McCLAIN: Okay. If it was served at her place of business, Alternatives, where she advertised her law office, Karen Kissler—we have an issue with labor board filed. She doesn't want to open mail, or when the sheriff shows up, she rejects things, closes the door of the law office.

"THE COURT: I'm not going to answer questions about a matter not before me. I don't know if that is true. I have to look at a motion or some reason for me to be considering that question. I can't just give out thoughts or advise on what-ifs on the law because it's more complicated than that."

Judge Nadler then set an order to show cause for September 15.

The minute order for June 16—the order that is at the heart of the issue here—reads in pertinent part as follows:

"Court notes proof of service was due as to Defendant Alternatives no later than March 9, 2016.

---

[5] The most experienced Judge Nadler was apparently, and rightfully, concerned about California Rules of Court, rule 3.110, subdivision (g). That is, if the defendant fails to serve a responsive pleading within the time limits specified by rule 3.110 and a judge had not granted an extension of time to respond, the plaintiff must file a request for entry of the defendant's default. The request must be filed within 10 days after the time for service has elapsed. A judge may issue an order to show cause why sanctions should not be imposed against the plaintiff if the plaintiff fails to file the request within this 10-day period.

10

"As to counsel KISSLER'S statement that she [was] improperly served, the Court notes proof of service was filed.

"Upon conclusion of discussion, the Court orders as follows:

"No later than July 22, 2016, a default must be filed for Defendant Karen Kissler ind. [*sic*] & dba Karen Kissler Esq. unless an answer has been filed.

"As to statements regarding improper service, a motion must be filed.

"Matter shall be continued to one further Order to Show Cause calendar on September 15, 2016 at 3:30 p.m. in Courtroom 17.

"CONTINUED FROM 06/16/2016 TO 09/15/2016 at 3:30 p.m. S17, FAILED TO TIMELY FILE P.O.S. DEFAULT, SANCTIONS COURT'S OWN MOTION TO DISMISS with reporter."

On June 29, without any further communication with Kissler—and without warning to her—McClain and Harrell filed a request for entry of default of "Karen Kissler, Individually & DBA Karen Kissler Esq. & Alternatives A Health Collective."

On July 5, Kissler filed what was labelled a "Motion to Quash Service and Vacate Clerk's Entry of Default Judgment," apparently filed on behalf of "Karen Kissler and Alternatives A Health Collective."[6]  Kissler's fundamental position was that the minute order was "confusing" and "susceptible to being misinterpreted"—a position, of course, with which I strongly agree, as discussed below.

But not only was the minute order "confusing," so too was the manner in which the superior court itself approached the situation, acting in a manner totally inconsistent with the law that applies once a default is filed, to the point of actually ruling on the merits of Kissler's motion to quash filed *after* the default.  The leading practical treatise describes the law this way:

---

[6] I say apparently because the actual motion is not in the record.

11

"[5:6] **Effect of default entry:** Entry of defendant's default instantaneously cuts off its right to appear in the action. The defendant is 'out of court.' It has no right to participate in the proceedings until either (a) its default is set aside (in which event, it may respond to the complaint), or (b) a default judgment is entered (in which event it may appeal). [Citation]."... [¶] ... [¶]

"(1) [5:7] **Jurisdictional:** Entry of default deprives the court of jurisdiction to consider any motion other than a motion for relief from default. (*W.A. Rose Co. v. Municipal Court* [*for Oakland-Piedmont Judicial Dist.* (1959)] 176 [Cal.App.2d] 67.)" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2018) ¶¶5:6–5:7, pp. 5-2 to 5-3.)[7]

The motion "to Quash Service and Vacate Default" came on for hearing on November 2 before Judge Nadler, prior to which he had entered a tentative ruling that the motion was "denied in full." Judge Nadler apparently heard from the parties at length, ending up continuing the matter to November 30 with this entry in the minutes: "The court also notes that it is also clear from Defendants' own papers that, regardless of any possible defect in service, Defendant was entirely aware of the lawsuit and who the Defendants were as far back as December 2015, when they filed the motion to expunge

---

[7] Despite this law, the Sonoma County clerk's office and the court itself acted inappropriately after the default, illustrated by a minute order for September 15, 2016 for the "DEFAULT SANCTIONS COURT'S OWN MOTION TO DISMISS":
"Court announces tentative decision
"The Court adopts its previously published tentative ruling
"Held and Continued:
"Journal Entry Details
"ORDER TO SHOW CAUSE  The Court finds notice to appear has been issued and served by mail. There is no appearance by either side. There being no opposition, Court adopts its previously published tentative ruling as follows:  This matter is continued to the Order To Show Cause calendar on January 5, 2017 at 3:30 p.m., in Department 17, for Settled Pleadings and Trial Setting Conference. A case management statement must be filed no later than fifteen (15) Calendar days before the hearing. . . ."

12

lis pendens.  Moreover, despite all of this, with service having supposedly taken place in January 2016, and despite discussing the issue with Plaintiffs and the court at the June 16, 2016 Case Management Conference (at which time this court informed the parties that Plaintiffs had until July 22, 201l6 to seek Defendants['] default and that Defendants needed either to file an answer or bring a motion to challenge service of the summons and compl[ai]nt, Defendants did nothing until after Plaintiffs had already entered their default.  Court and Parties discuss issues.  Defendant has papers she wants to file, noting problems with service of moving papers.  Court hears argument from Defendant, Court addresses Plaintiff, and will be giving her a chance to respond to Defendant's filing. Court continues case to 11/30/2016 at 3 p.m. in dept 17.  Plaintiff to file and serve opposition papers by 11/16/2016."

That, of course, is utterly inconsistent with a default situation.

On November 16, McClain and Harrell filed declarations, and Kissler filed further declarations on November 21 and 22.

And then, on November 30, Kissler filed the motion before us here:  the motion to vacate.  The motion was based on Code of Civil Procedure section 473, subdivision (b), and sought discretionary relief based on "mistake, inadvertence, surprise or excusable neglect."  And as to the default against Alternatives, the motion was also based on the mandatory relief provision in subdivision (b), based on in Kissler's sworn "affidavit of fault."

Against that background, the motion continued by Judge Nadler from November 2 came on for hearing on November 30, with McClain, Harrell, and Kissler all present. Judge Nadler indicated his "intent to alter the tentative ruling," which he did, changing it to denying "the motion to quash" only.  This is how the minute order begins:  "Law & Motion Calendar Issue:  Motion to Quash Counsel KISSLER indicates she is will[ing] to submit to the tentative ruling, but has some housekeeping adjustment requests.  She speaks to motions on file.  Court and counsel KISSLER discuss motions on file.  Court

13

indicates its intent to alter the tentative ruling. Court addresses Plaintiffs regarding the potential change to the tentative ruling. Ms. MCCLAIN responds and argues the change. Counsel KISSLER responds and makes further statements regarding the change. Upon conclusion of oral argument, the Court adopts the tentative ruling with the modification to the first sentence as follows: Defendants' Motion to Quash Service is denied."[8] So, Judge Nadler changed his ruling from one including denial of Kissler's motion to vacate, to one denying only the portion of it seeking to quash.

According to the register of actions, more activity inconsistent with a default occurred over the next few months, including case management statements filed by McClain and Harrell on December 21 and by Kissler on December 22.

On January 5, 2017, the case came on for an order to show cause before the Honorable Peter Ottenweller, apparently his first entry into the matter. The minute order for that day reflects the following: "Order to Show Cause Calendar The Court finds notice to appear has been issued and served by mail. Court's previously posted tentative ruling: Case will be continued to a further Order to Show Cause calendar in Courtroom 17; to 4/13/17, 3:30 p.m., for settled pleadings or confirmation of judgment, Oral argument requested by Plaintiffs. Court and parties discuss issues. Related case SCV-258091. Default documents submitted by Plaintiffs; returned by the Court. . . . Court and parties further discuss issues. Plaintiffs do not agree to binding arbitration and request default judgment go forward; resubmitted to the Clerk's Office. Upon conclusion of discussion, the Court orders as follows: Trial date set for January 6, 2017 in SCV-258091 shall be continued to the same date as the motion to vacate in this case SCV-258139 on March 15, 2017, at 3:00 p.m., in Courtroom 17. The trial shall trail as it

---

[8] Once again, this is utterly inconsistent with a default situation, as the court has "no jurisdiction" to consider any motion other than a motion for relief from default. (*W.A. Rose Co. v. Municipal Court for Oakland-Piedmont Judicial Dist.* (1959) 176 Cal.App.2d 67, 71.)

14

relates to the motion to vacate. Defendant shall provide Plaintiffs with copies of the motion to vacate by mail or personally no later than January 10, 2017. Plaintiffs must follow Rules of Court if they wish to oppose the motion."

The motion to vacate came on as rescheduled, on March 17, with McClain, Harrell, and Kissler all present. But both sides had attorneys with them, Mr. Byrne on behalf of McClain and Harrell, and Mitchell Greenberg on behalf of Kissler. The attorneys were not counsel of record, and so Judge Ottenweller continued the matter to May 24 to allow counsel to substitute in, also allowing the parties to file even further briefing.

The matter came on as rescheduled, prior to which Judge Ottenweller had issued a tentative ruling. McClain and Harrell appeared on their own behalf, Mr. Greenberg on behalf of "Kissler and Alternatives." The hearing would last over a half-hour, and began with Judge Ottenweller addressing Mr. Greenberg, to "go ahead and tell me why I should change my tentative." And so he did, beginning for the first seven pages of the transcript addressing the status of Alternatives as an independent legal entity registered with the state, with bylaws and articles of incorporation. Mr. Greenberg then turned to the issue of Kissler personally, and how she interpreted the June 16 minute order. And the following colloquy occurred:

"[MR. GREENBERG]: That was the mistake that Ms. Kissler made. She interpreted it one way. The Court apparently interprets it another. She almost immediately sought to rectify that about nine days later and filed her motion. This is not a situation where she sat on her rights. She was in court. She read the order. She read it apparently inconsistent with the way the Court is reading it, and then she took steps as immediately as she could to go ahead and rectify it. To my mind, that's a mistake. That's the mistake that's in the discretionary [Code of Civil Procedure section] 473. You can call it excusable neglect. You can call it mistake. Personally, I think it's a mistake. I—

15

"THE COURT:   Mr. Greenberg, how do you swear to [*sic*: square?] the fact that a proof of service is filed in this court?  Ms. Kissler then, in response to that complaint on May 9th, 30 days before this OSC hearing, says that she's filing a notice of unavailability for certain periods of time.  Clearly, she understood and had this complaint since its proof of service but did nothing until her motion that she sought to quash.  Why the delay?

"MR. GREENBERG:   She believed, at that time, and she may still believe, that this was a complaint that—for a service for which should be quashed.  She believed that. It became clear to her in June, after the CMC, that Judge Nadler needed to make this issue—needed this issue dealt with one way or another by July 22nd.  Was there some delay between May 9th and mid-June in responding?  Yeah.  That's a month delay. That's true.  That's a month delay, but—but the mistake that we're looking at actually doesn't become ripe until Judge Nadler issues his ruling in mid-June where he makes the statement that Ms. Kissler interprets differently, so she gets served, perhaps.  She doesn't believe the service is proper.  Things happen up until May 9th.  She clearly knows that there's an issue of whether service has been made, but she doesn't believe service has been made.  They get to the OSC, and Judge Nadler says, you guys have to figure this out by July 22nd and makes his order, and at that point, it becomes—this mistake becomes ripe, because that's what she misinterpreted.

"THE COURT:   You believe that by her appearing before Judge Nadler and describing the fact that she had to appear in the case or default would be entered and she continued to wait longer was reasonable?

"MR. GREENBERG:   It was a mistake, but you look at how active Ms. Kissler was in this litigation, both before June 2016 and after June 2016, she—

"THE COURT:   Very active.

"MR. GREENBERG:   Very active.  She is not the kind of litigant who just, you know, just decides that she's not going to participate and lets things go on, and on, and on.  She is very active.  She makes a mistake in June, but she is very active, and so when

16

she writes in her declaration in support of this motion that she understood that there was not a race to the courthouse, but there was this July 22nd deadline, that was her good faith belief. It was a mistake, and I believe, your Honor, under [Code of Civil Procedure section] 473, to penalize someone for that mistake reading the language of Judge Nadler's order, which, in my opinion, is not very clear, has to be something that the Court takes a look at in its discretion and says that the public policy of the State of California is that these matters should be heard on their merits, and this case clearly will not be heard on its merits if your Honor does not grant this motion, because it will go to default and then to default judgment."

Mr. Greenberg then turned to something "unique to this case" and not something addressed in Judge Ottenweller's tentative ruling: Judge DeMeo's summary adjudication in action No. SCV-258091. As Mr. Greenberg described it: "[T]his court, in Judge DeMeo's courtroom, issues an order for summary adjudication in a companion case which says that Ms. Kissler is not a party to the very contract that is in the first cause of action of this case. This case is about breach of contract. This other case that was in front of Judge DeMeo is the same contract. This is all in my supplemental papers, but your Honor did not address it in the tentative, so I want to address it here. There's a contract. There's a default taken against Ms. Kissler. If you don't overturn that default, that's going to go to a default judgment on a contact that Judge DeMeo has ruled Ms. Kissler is not a party to.

"So now we have Ms. Kissler who makes a bad judgment. She makes a mistake in June, and the cascade of that is she's going to have a judgment against her for what's in the complaint, over $100,000 potentially, on a contract that Judge DeMeo has already ruled she's not a party to . . . ."

Then, in response to a question from Judge Ottenweller, Mr. Greenberg quoted from Judge DeMeo's order:

17

" 'Therefore, there are no [triable] issues as to any liability or exposure with respect to Plaintiff, Karen Kissler, individually or as an attorney herein.'

"And then his order further says,

" 'Plaintiff's motion for an order adjudicating Plaintiff, Karen Kissler, individually on the ground that she was not a party to the subject agreement in this action is granted. Further, Kissler's motion for an order adjudicating that she was not a party to this subject agreement in her capacity as a licensed California attorney.'

"It was also granted, so that has happened, and we are looking at the potential of the judgment against someone who was not even a party to the contract which is the very subject of this case. Your Honor has the discretion, and, in fact, the court in *Rappleyea*, [*supra*, 8 Cal.4th 975] which was cited in our papers, which is California Supreme Court, sets forth the equitable power to set aside the default, and we've satisfied all of those requirements.

"She has a meritorious defense. In fact, she's not a party to the contract. She has a satisfactory excuse for interpreting the minute order, and she diligently sought relief in early July from the late June default, so I would posit, your Honor, that there is a strong public policy with regard to hearing these cases on the merits. To have this case not be heard on the merits under these circumstances, would be a horrible mischaracter [*sic*] of justice."

Judge Ottenweller then turned to McClain, who among other things said that as she understood Judge Nadler's tentative ruling, she "immediately understood [she] better get to the courthouse . . . and get the clerk's judgment as quick as I could . . . ."

Two pages later the hearing ended, with Judge Ottenweller taking the matter under submission, with these remarks: "I need to take a look more carefully at the companion case in this matter.

"What I would like to do is, Mr. Greenberg, I would like from the Kissler side of this a declaration that sets forth the business purpose of Alternatives so that I can have

18

some substance to what you are representing to the Court here in court, and that declaration is to be provided to my chambers no later than May 31st.

"If Ms. McClain wishes to provide any kind of response to the declaration, it should be in declaration form provided directly to my chambers no later than June 9th.

"I will have a decision on this matter no later than June 30th. All right. Thank you all."

Greenberg provided the material pertinent to Alternatives, 54 pages of material to be exact.

On June 30, Judge Ottenweller filed a five-page order denying the motion to vacate, without citation to, much less discussion of, any of the cases or principles governing how he was to approach the motion before him. To the contrary, Judge Ottenweller went out of his way to reject the motion, as demonstrated by his approach to the matter, which began as follows:

"Defendants' argument that the default resulted from their excusable neglect, mistake, inadvertence, or surprise is unpersuasive. The order cited above could not reasonably be interpreted as allowing Defendants to do nothing and wait for Plaintiffs to file, or not file, a default by the deadline given. At no point did the court indicate that Defendants could bring the motion to quash up through July 22, 2016, without the threat of a default being entered earlier and at no point did the court indicate that a motion to quash would be granted. Plaintiffs entered the default within the deadline given, a deadline of which Defendants were expressly aware.

"Moreover, the history of Defendants' conduct, which resulted in the default being possible, makes it glaringly clear that for months Defendants knowingly failed to answer or file other appropriate challenge to the pleading or service despite not only knowing of the action, but actually taking part in it."

From there, Judge Ottenweller went on to discuss how Kissler's motion to quash could not succeed, followed by criticism of Kissler for not "marking any boxes"

19

concerning service issues in her July 5 CMC statement. Judge Ottenweller then turned to a two-page discussion of the "new argument" based on Judge DeMeo's summary adjudication, essentially concluding that such was not a basis for relief under Code of Civil Procedure section 473. And his order ended with two brief conclusory paragraphs rejecting the argument that Alternatives was entitled to mandatory relief for attorney fault because "the decisions and errors of the attorney, Kissler, are also clearly one and the same as those of the client because Kissler was also the owner and CEO of Alternatives, making the decision in both that capacity and as the attorney."

On August 29, Kissler and Alternatives filed this appeal.

## DISCUSSION
**Judge Ottenweller Abused His Discretion in Denying Relief Under Code of Civil Procedure Section 473, Subdivision (b)**

Code of Civil Procedure section 473, subdivision (b), states that a court "may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." This part of section 473 is recognized as invoking the trial court's discretion, and to obtain such discretionary relief, the moving party must show the requisite mistake, inadvertence, or excusable neglect. (*Bonzer v. City of Huntington Park* (1993) 20 Cal.App.4th 1474, 1478.) Section 473 also requires that the party diligently seek relief "within a reasonable time, in no case exceeding six months, after the judgment, dismissal, order, or proceeding was taken." (Code Civ. Proc., § 473, subd. (b).)

Kissler and Alternatives acted diligently here, fundamentally arguing that Judge Nadler's minute order was unclear, thus leading to Kissler's conduct here. I agree.

This court discussed the applicable law at length, in *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681 (*Fasuyi*), where we reversed the trial court and ordered that

20

the default and default judgment be set aside and defendant *Permatex* be allowed to file a response. This is what we said:

"Twenty years ago we set out the governing principles, in *McCormick v. Board of Supervisors* (1988) 198 Cal.App.3d 352, a case involving a dismissal of a CEQA (California Environmental Quality Act; Pub. Resources Code, § 21000 et seq.) petition for failure to timely request a hearing. The trial court denied relief sought under section 473. We reversed. After first holding that section 473 relief was available in the CEQA-notice context, we went on:

" 'The next question is whether the trial court erred in refusing to grant section 473 relief under the facts herein. Our standard of review is well articulated by the California Supreme Court in *Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233: "A motion seeking such relief lies within the sound discretion of the trial court, and the trial court's decision will not be overturned absent an abuse of discretion. [Citations.] However, the trial court's discretion is not unlimited and must be ' "exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." ' [Citations.] [¶] Section 473 is often applied liberally where the party in default moves promptly to seek relief, and the party opposing the motion will not suffer prejudice if relief is granted. [Citations.] In such situations 'very slight evidence will be required to justify a court in setting aside the default.' [Citations.] [¶] Moreover, because the law strongly favors trial and disposition on the merits, any doubts in applying section 473 must be resolved in favor of the party seeking relief from default [citations]. Therefore, a trial court order denying relief is scrutinized more carefully than an order permitting trial on the merits. [Citations.]" ' (*McCormick v. Board of Supervisors, supra,* 198 Cal.App.3d at pp. 359–360.)

"Last year we elaborated on the concept of abuse of discretion, in *People v. Jacobs* (2007) 156 Cal.App.4th 728. Holding that there was an abuse of discretion in denying a continuance, we ended our discussion with this observation: 'In *Concord Communities v.*

21

*City of Concord* (2001) 91 Cal.App.4th 1407, 1417 our colleagues in Division Four of this court observed that "Abuse of discretion has at least two components: a factual component . . . and a legal component. [Citation.] This legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal. 422, 424: 'The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . ' "

" 'All this is well described in Witkin where, likewise citing the still vital *Bailey v. Taaffe, supra,* 29 Cal. 422, 424, the author distills the principle as follows: "Limits of Legal Discretion. [¶] The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. (See 5 Am.Jur.2d, Appellate Review § 695.) . . . " (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 358, pp. 406–407.)' (*People v. Jacobs, supra,* 156 Cal.4th at pp. 737–738.)

"Applying that law here leads inescapably to the conclusion that the trial court abused its discretion here—all legal principles favored Permatex.

"The most fundamental of those principles is that affirmed in *Au-Yang v. Barton* (1999) 21 Cal.4th 958, 963: ' "[T]he policy of the law is to have every litigated case tried upon its merits, and it looks with disfavor upon a party, who, regardless of the merits of the case, attempts to take advantage of the mistake, surprise, inadvertence, or neglect of his adversary." ' (*Ibid.*, citing among other cases, *Weitz v. Yankosky* (1966) 63 Cal.2d 849, 855 (*Weitz*).)

" 'Because the law favors disposing of cases on their merits, "any doubts in applying section 473 must be resolved in favor of the party seeking relief from default

22

[citations]. Therefore, a trial court order denying relief is scrutinized more carefully than an order permitting trial on the merits." ' (*Rappleyea, supra,* 8 Cal.4th at p. 980, quoting *Elston v. City of Turlock, supra,* 38 Cal.3d at p. 233 (*Elston*).) In Witkin's typically succinct statement of the rule, the remedial relief offered by section 473 is 'highly favored and is liberally applied.' (8 Witkin, Cal. Procedure, Attack on Judgment in Trial Court, supra, § 152, pp. 653–654 and numerous cases there collected.)

"As a result of those principles, the Supreme Court has recognized that if a defendant promptly seeks relief (as Permatex did here) and there is no showing of prejudice to Fasuyi (as is the case here), ' "very slight evidence will be required to justify a court in setting aside the default." ' (*Elston, supra,* 38 Cal.3d at p. 233.) Or as *Elston* put it two pages later, '[u]nless inexcusable neglect is clear, the policy favoring trial on the merits prevails.' (*Id.* at p. 235.) There was more than slight evidence here. And no inexcusable neglect." (*Fasuyi*, *supra*, 167 Cal.App.4th at pp. 694–696.)

The most recent default case was filed just weeks ago: *Lasalle v. Vogel* (2019) 36 Cal.App.5th 127. There, in a beautifully crafted opinion by Justice Bedsworth that began with a reminder of the need for civility in litigation (*id.,* at pp. 132–135), the court went on to reverse the order denying the defendant attorney relief from default taken against her—indeed, despite that a warning was given. Doing so, the opinion began with this distillation of the default-related law:

"We acknowledge the standard of review for an order denying a set-aside motion is abuse of discretion. [Citation.] But there is an important distinction in the way that discretion is measured in section 473 cases. The law favors judgments based on the merits, not procedural missteps. Our Supreme Court has repeatedly reminded us that in this area doubts must be resolved *in favor of relief*, with an order denying relief scrutinized more carefully that an order granting it. As Justice Mosk put it in *Rappleyea*, 'Because the law favors disposing of cases on their merits, "any doubts in applying section 473 must be resolved in favor of the party seeking relief from default [citations].

23

Therefore, a trial court order denying relief is scrutinized more carefully than an order permitting trial on the merits." [Citations.]' (*Rappleyea, supra,* [8 Cal.4th] at p. 980.)

"Warning and notice play a major role in this scrutiny. Six decades ago, when bench and bar conducted themselves as a profession, another appellate court, in language both apropos to our case and indicative of how law ought to be practiced, said, 'The quiet speed of plaintiffs' attorney in seeking a default judgment without the knowledge of defendants' counsel is not to be commended.' (*Smith v. Los Angeles Bookbinders Union* (1955) 133 Cal.App.2d 486, 500.)

"In contrast to the stealth and speed condemned in *Bookbinders*, courts and the State Bar emphasize warning and deliberate speed. The State Bar Civility Guidelines deplore the conduct of an attorney who races opposing counsel to the courthouse to enter a default before a responsive pleading can be filed. (*Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 702 (*Fasuyi*), quoting Cal. State Bar, California Attorney Guidelines of Civility and Professionalism (2007) § 15.) Accordingly, it is now well acknowledged that an attorney has an *ethical* obligation to warn opposing counsel that the attorney is about to take an adversary's default. (*Fasuyi, supra,* at pp. 701–702.)" (*Lasalle v. Vogel, supra,* 36 Cal.App.5th at pp. 134–135, fns. omitted.)

*Fasuyi*, *Lasalle*, and all the Supreme Court cases cited above held that the default involved could not stand. Likewise here.

As shown above, Judge Ottenweller ignored all pertinent principles governing the issue before him, essentially concluding, on an ipse dixit basis—and without even quoting the order—that Kissler simply could not have been mistaken, or excusably neglectful, in her interpretation of the June 16 minute order.

The majority affirms that order, without any meaningful analysis of its own, in an opinion that, as mentioned above, ignores every single guiding principle, including that an order denying section 473 relief is to be "scrutinized more carefully." (*Elson v. City of Turlock, supra,* 38 Cal.3d at p. 233.) The majority has no scrutiny at all, let alone

24

scrutiny that is careful. And, it is fair to say, under the guiding principles the record must be viewed favorably from the standpoint of Kissler. The majority approach is 180 degrees contrary.

With its misguided approach, the majority concludes that "defendants have not shown that the trial court abused its discretion" in rejecting Kissler's claim. This is what follows: "To start with, defendants have not provided an adequate appellate record for us to consider this issue." (Maj. opn., p. 18.) And then, after 15 lines of what is claimed to be missing, the majority concludes: " 'As the party challenging a discretionary ruling, [defendants] had an affirmative obligation to provide an adequate record so that we could assess whether the court abused its discretion.' (*Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 259 [challenge to court's denial of discretionary relief from default held forfeited by failing to provide hearing transcript or copy of ruling].)"

I have two reactions.

First, McClain and Harrell did not argue forfeiture, and I do not understand it is appropriate for an appellate court to go off on a basis not made in the briefing, least of all in the circumstance where the ruling below is to be carefully scrutinized.

Second, even if the majority's reaching out to benefit McClain and Harrell were appropriate—which it is not—*Wagner*, the case it cites, is inapplicable. There, the Court of Appeal said that its review "has been thwarted by [appellant's] failure to provide us with a transcript of the hearing on the motion or a copy of the court's minute order denying the motion." (*Wagner v. Wagner, supra,* 162 Cal.App.4th at p. 259.) Those items, and a whole lot more, are before us here.

Following that, the majority says this: "Even considering the issue on the merits on the basis of this limited record, however, there was no abuse of discretion, much less clear abuse. The issue is not even close. [¶] *First*, the trial court was entitled to find— and did find—that Kissler was not credible and that she did not make the factual mistake she claimed to have made." (Maj. opn., p. 19.) And on the next page, this: "we must

25

defer to the trial judge's assessment of Kissler's credibility. (*Falahati v. Kondo* (2005) 127 Cal.App.4th 823, 828 ['It is the province of the trial court to determine the credibility of the declarants and to weigh the evidence'].)" While Judge Ottenweller concluded Kissler's argument was "unpersuasive," not once in his five-page order does he use the word "credible" or comment on credibility.

The majority concludes its discussion affirming the rejection of section 473 relief with discussion of some "rules," as follows:

"Further, Kissler's claimed 'misunder[standing],' even if it had been genuine, rested on the same ignorance of the basic rules we have already discussed—including that defendants were required to respond to the complaint within 30 days of service; if they did not do so plaintiffs could take their default; and defendants had waived jurisdictional defects by participating in the case without having first moved to quash service. No litigant who had bothered to apprise him or herself of these very basic litigation rules would have believed defendants' prior, ongoing and continued failure to respond to the complaint five or six months into the case did not expose them to the risk of a default or interpreted Judge Nadler's order as conferring permission on defendants to continue to sit on their hands for another 37 days." (Maj. opn., p. 22, fn. omitted.)

Rules. Rules. Rules. The issue here is not about rules. It is about Kissler's interpretation of the June 16 minute order, a minute order that Judge Nadler would himself later describe in the minute order from November 2 hearing this way: at the June 16 hearing "this court informed the parties that Plaintiffs had until July 22, 2016 to seek Defendants['] default and that Defendants needed either to file an answer or bring a motion to challenge service."

The minute order was, Kissler asserts, "unclear," and as she interpreted it, she believed she could do what she did. Certainly the minute order was unclear. Call it confusing. Or ambiguous. Or vague. It obviously was subject to interpretation. In my dissent to the majority's original opinion, I made this challenge: "I would challenge

anyone, including the majority, to set forth precisely when it was that Kissler had to act prior to the July 22 default date. June 18? The 27th? July 5? When? And as to what was she to file, it included what she did file. Just as Judge Nadler said: if her position was about 'improper service,' a 'motion must be filed.' "

The revised majority opinion responds this way: "The dissent then poses a rhetorical 'challenge' to 'set forth precisely when it was that Kissler had to act prior to the July 22 default date.' [Citation.] The answer is not difficult: *immediately*. At minimum, very, very promptly. . . ." (Maj. opn., p. 25.) Really? And a court would let it stand? Not one following the rules.

As mentioned, *Fasuyi, supra,* 167 Cal.App.4th 681, reversed the trial court with instructions to allow Permatex, the defendant manufacturer, to file a responsive pleading. After discussing the myriad reasons why, we ended our discussion with descriptions of Permatex's conduct, which included "[n]o lack of cooperation . . . . No deception. No duplicitousness. No stonewalling. No evasion. And no disregard of any warning. In fact, no warning." (*Id.* at p. 701.)

While all those adjectives may not be applicable to Kissler, some are. And one thing is certain—she was fighting McClain and Harrell all the way. She was, as Judge Ottenweller noted, a "very active" participant. And she should have been warned before any default was entered. As we put it in *Fasuyi*: "It will be recalled that Fasuyi's counsel had been in contact with ITW's legal department . . . . Notwithstanding that, Fasuyi's counsel took the default without so much as a reminder, let alone a warning, about any responsive pleading. Permatex argues this was 'unfair.' We agree, as such warning is at the least an *ethical* obligation of counsel, as well described in Weil and

27

Brown, California Practice Guide:  Civil Procedure Before Trial, *supra*, ¶¶ 5:68 to 5:71, pp. 5-16 to 5-17 (rev. # 1, 2007) . . . .”[9]  (*Fasuyi, supra,* 167 Cal.App.4th at p. 701.)

*Lasalle v. Vogel, supra,* 36 Cal.App.5th 127, the recent case quoted above, discussed the evolution of the law concerning defaults, and the ethical obligation to warn, including within which was this observation:  “So to the extent it was possible for a party

---

[9] Here is how the current version of Weil & Brown describes it:

“[5:68]:  **Ethical Obligation to Warn Opposing Counsel:**  If plaintiff’s counsel knows the identity of the lawyer representing defendant, he or she owes an ethical obligation to warn before requesting entry of defendant’s default.  Failure to do so is a *professional discourtesy* to opposing counsel that will not be condoned by the courts:  ‘The quiet speed of plaintiffs’ attorney in seeking a default judgment without the knowledge of defendants’ counsel is not to be commended.’  [Citations.]  *Fasuyi v. Permatex, Inc.* (2008) 167 [Cal.App.4th] 681, 701 . . . (citing and quoting text)]

“ ‘Even legitimate tactics must sometimes yield to the only goal that justifies the very existence of our judicial system, i.e., the resolution of our citizens’ disputes and the administration of justice.’  (*Brown v. Presley of So. Calif.* (1989) 213 [Cal.App.3d] 612, 620 . . ., fn. 3 . . . —[the notion that ours is a ‘dog-eat-dog business’ governed by the ‘law of the jungle’ should be curtailed, not rewarded].)

“[ 5:69] **No legal obligation**:  The duty to warn opposing counsel is an ethical rather than a legal requirement.  As noted by one court, ‘While as a matter of professional courtesy counsel should have given notice of the impending default, and we decry this lack of professional courtesy … counsel was *under no legal obligation* to do so.’  [Citations, including *Fasuyi*.]

“[5:70] **Effect of failure to warn**:  In the absence of a prior warning of default, courts are inclined to grant [Code of Civil Procedure section] 473[subdivision] (b) motions to set aside defaults. [Citations, including *Fasuyi*.]

“But in the absence of an ‘attorney affidavit of fault’ (see ¶ 5:292 *ff*.), such relief is not mandatory; and denial of relief is not necessarily an abuse of discretion.  I.e., the failure to warn *does not require* the court to grant relief.  [Citations, including *Fasuyi*.]

“[5:71] **PRACTICE POINTER**:  If you’re representing plaintiff, and have had *any* contact with a lawyer representing defendant, don’t even *attempt* to get a default entered without first giving such lawyer *written* notice of your intent to request entry of default, and a *reasonable time* within which defendant’s pleading must be filed to prevent your doing so. (*Fasuyi v. Permatex, Inc.*, *supra*, 167 [Cal.App.4th] at [p.] 701 . . . (quoting text).)”  (Weil & Brown, Cal. Practice Guide:  Civil Procedure Before Trial (The Rutter Group 2019) ¶¶ 5:68–5:71, pp. 5-18 to 5-19.)

28

seeking a default with unseemly haste to commit an *ethical* breach without creating a *legal* issue, that distinction was erased by [Code of Civil Procedure] section 583.130. The ethical obligation to warn opposing counsel of an intent to take a default is now reinforced by a statutory policy that all parties 'cooperate in bringing the action to trial or other disposition.' ([Code Civ. Proc.,] § 583.130.)  Quiet speed and unreasonable deadlines do not qualify as 'cooperation' and cannot be accepted by the courts.  [¶]  We cannot accept it because it is contrary to legislative policy and because it is destructive of the legal system and the people who work within it.  Allowing it to flourish has been counterproductive and corrosive." (*Id.* at p. 137.)  From there, the court went on to reverse the order denying to set aside a default, despite a warning from counsel, citing several reasons why, including that the warning given was not reasonable.  (*Id.*, at pp. 138–140.)  The situation here is a fortiori.[10]

### Judge Ottenweller Erred in Denying Mandatory Relief to Alternatives

As noted above, as to the default of Alternatives, the motion to vacate was also based on the mandatory provision in Code of Civil Procedure section, 473, subdivision (b), which states that "whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, [the

---

[10] The majority dismisses the absence of warning here because plaintiffs were not attorneys.  As this court has written numerous times, pro per litigants are held to the same standards as attorneys.  (See *Rappleyea v. Campbell, supra,* 8 Cal.4th at p. 985 ["A doctrine generally requiring or permitting exceptional treatment of parties who represent themselves would lead to a quagmire in the trial courts, and would be unfair to the other parties to litigation"]; *In re Marriage of Falcone* (2008) 164 Cal.App.4th 814, 830 ["self-represented parties are entitled to no greater consideration than other litigants and attorneys"]; *Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125–1126 [" 'When a litigant is appearing in propria persona, he is entitled to the same, but no greater, consideration than other litigants and attorneys. . . . Further, the in propria persona litigant is held to the same restrictive rules of procedure as an attorney' "].)

29

court shall] vacate any (1) resulting default entered by the clerk . . . or (2) resulting default judgment or dismissal entered against his or her client . . . ."

Judge Ottenweller denied the mandatory relief, in two short paragraphs. And the reason, he said, was this: there was "no distinction between Ms. Kissler and Alternatives. She founded, established and is its CEO, Secretary and CFO. There are no other corporate officers. She reports only to herself. [¶] In this action, the decisions and errors of the attorney, Kissler, are also clearly one and the same as those of the client because Kissler was also the owner and CEO of Alternatives, making the decision in both that capacity and as the attorney. Relief is not mandatory based on an attorney affidavit of fault where the fault is also that of the party. See *Todd v. Thrifty Corp.* (1995) 34 Cal.App.4th 986, 991; *Lang v. Hochman* (2000) 77 Cal.App.4th 1225, 1248. There is no effective difference between the decisions of Alternatives and the decisions of its attorney. Therefore, she cannot avail herself of the mandatory relief provision of [Code of Civil Procedure] section 473."

This was error.

The evidence—the undisputed evidence—was that Alternatives was incorporated on January 11, 2010 as a Nonprofit Mutual Benefit Corporation under the Corporations Code. It was comprised of over 21,000 members, who were "akin to shareholders," and was "a licensed and permitted brick and mortar cannabis dispensary." And in accordance with the Attorney General's Guidelines for mutual benefit corporations, Alternatives returned its profits back to its members, after deducting for salaries, overhead and other expenses—facts, the majority concedes, supported by the evidence. (Maj. opn., p. 30.) When Kissler interpreted the court's June 16, 2016 CMC Order, she did so at least in part in her capacity as the *attorney for her client, Alternatives*, a corporation—which, not incidentally, must appear in court only through its attorney.

As quoted, Judge Ottenweller relied on two cases: *Todd v. Thrifty, supra,* 34 Cal.App.4th 986 and *Lang v. Hochman*, *supra*, 77 Cal.App.4th 1225. *Todd* is

30

inapplicable, as the dismissal was for failure to comply with a discretionary order, which plaintiff's counsel conceded was caused by "plaintiff's personal problems." (*Todd*, *supra*, at p. 991.) And *Lang* is an outlier, as the leading practice treatise explains:

**"Client partially at fault?** One case states mandatory relief under [Code of Civil Procedure section] 473 is available 'only if the party is *totally innocent* of any wrongdoing and the attorney was the *sole* cause of the default or dismissal.' (*Lang v. Hochman* (2000) 77 [Cal.App.]4th 1225, 1248 (emphasis added).)

"Other courts, however, distinguish between *negligence* and *intentional misconduct*, and hold relief mandatory where the default was caused in part by the client's negligence. (*Benedict v. Danner Press* (2001) 87 [Cal.App.]4th 923, 930–932, [default resulted both from client's mistake regarding whether he had been personally served and counsel's negligence in failing to challenge process server's declaration of service]; *SJP Ltd. Partnership v. City of Los Angeles* (2006) 136 [Cal.App.]4th 511, 519, —even if client 'equally at fault' in failing to obtain representation, [section] 473(b) merely requires that attorney's conduct be a cause in fact of entry of default, not the only cause; (*Martin Potts & Assocs., Inc. v. Corsair, LLC* (2016) 244 [Cal.App.]4th 432, 442 [collecting cases].)" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 5.295.5a, p. 5-81 to 5-82.)

The first case cited by the authors, *Benedict v. Danner Press*, is a decision by this court. There, the default resulted from a combinations of a client's mistake (regarding whether he had been personally served) and counsel's negligence in failing to challenge the process server's declaration of service. We granted relief, explaining our holding in terms of "causation in fact":

"On its face, section 473, subdivision (b), does not preclude relief under the mandatory provision when default is entered as a result of a combination of attorney and client fault. The statute merely requires that the attorney's conduct be a cause in fact of the entry of default (see § 473, subd. (b)), but does not indicate that it must be the *only*

31

cause.  In *Milton* [*v. Perceptual Development Corp.* (1997) 53 Cal.App.4th 861, 867], the appellate court considered the causation requirement of the mandatory relief provision of section 473, subdivision (b).  (*Milton*, *supra*, 53 Cal.App.4th at p. 867.)  The court concluded that the proximate cause standard for legal malpractice actions should also apply to the causation requirement of the mandatory provision of section 473, subdivision (b).  (*Milton*, at p. 867.)  Under that standard, 'a lawyer's negligence need not be the only proximate cause of a client's injury so long as there is causation in fact.' "  (*Benedict v. Danner Press, supra,* 87 Cal.App.4th 923, 928–929.)

Here, as to Alternatives, there was a fundamental demarcation of roles:  Kissler was the "attorney" and Alternatives was the "client," as the unchallenged declaration of Kissler stated:  "[T]he mistake I made in connection with the failure to file a response to the complaint before the Plaintiffs filed their request for entry of default, was in my role as Alternatives' corporate attorney.  I filed each and every court document under my letterhead stating I represented the defendants herein and acted as an attorney . . . ."

Kissler complied with the mandatory provision under section 473(b), and swore under oath to her mistake, which mistake directly resulted in the entry of Alternatives' default.  Judge Ottenweller simply got it wrong in deciding that "she cannot avail herself" of the mandatory relief provision of Code of Civil Procedure, section 473.[11]

**The Default Judgment is Not Supported by the Record**

An additional, and independent, reason why the default judgment must be vacated is that it is unsupported by the record, and thus in violation of the gatekeeper function required of the trial court.  In *Grappo v. McMills* (2017) 11 Cal.App.5th 996 (*Grappo*) we affirmed a trial court order granting relief from a default judgment because it was not supported by the record there, most significantly because the complaint did not state a

---

[11] Judge Ottenweller's choice of words "she" and "herself" in his decision in place of the words "Alternatives" and "itself," shows how he misconstrued the matter:  "she," Kissler, was not the party moving to vacate on mandatory grounds; Alternatives was.

claim against the defaulted defendant—which, as noted, is precisely the situation here. Doing so, we discussed the importance of the trial court's role as "gatekeeper," to ensure that any default judgment is in fact supported by the pleadings.

*Grappo* was recently discussed in the publication California Judges Benchbook: Civil Proceedings Before Trial (CJER 2019) (Benchbook), which is one of the four benchbooks that "provide practical working tools to assist judges in conducting civil proceedings fairly, correctly, and efficiently. They are written from the judge's view point, and give judges concrete advice on what to look for and how to respond. . . . [¶] The Benchbooks distill the judicial wisdom and experience of a broad cross-section of California's leading judges." (*Id.*, at Preface.) And this is what that practical treatise had to say: "The judge's duty to act as a 'gatekeeper' was emphasized in *Grappo v. McMills* (2017) 11 [Cal.App.5th] 996, 1000 . . . , in which the appellate court published its opinion 'to remind trial courts that however burdened they may be, they must vigilantly attend to their duty in connection with the default process, "to act as gatekeeper, ensuring that only the appropriate claims get through." ' It held that the plaintiff's claim in that case should not have gotten through and a default judgment should not have been entered due to numerous material defects in the plaintiff's complaint. 11 [Cal.App.5th] at [p.] 1000. It noted that '[p]roper application of the gatekeeper function should have precluded any default judgment,' " going on to set out the four reasons we held as we did. (*Id.*, § 16.28 at p. 1566.)

And the next paragraph of the practical treatise instructed the trial court what it must do: "*Judicial Practice*: In advance of the prove-up hearing, the judge should review the court file, analyze the complaint, research the necessary elements of each cause of action and the applicable law, and ascertain the relief that the plaintiff is seeking either in the complaint or in the statement of damages. This preparation enables the judge to pose the appropriate questions at the hearing, requiring the plaintiff to prove its

33

cause of action and the amount of damages claimed." (Benchbook, *supra*, § 16.28 at p. 1567.)

Judge Ottenweller did not do that here.

As noted, the default judgment is against Kissler and Alternatives. As also noted—and quoted—McClain and Harrell's breach of contract claim alleged that "Karen Kissler would employ Plaintiffs." The majority's cavalier "reading" of the complaint notwithstanding (see fn. 4 ante), Alternatives is nowhere mentioned in the breach of contract claim.[12] No default judgment against it can stand.

*Falahati v. Kondo, supra,* 127 Cal.App.4th 823, the case relied on by the majority for deference on credibility, is on point. And dispositive—for Alternatives. The Court of Appeal noted that the credibility determination "does not end the matter, however, because whether the default and default judgment complied with constitutional and statutory requirements are questions of law as to which we exercise independent review." (*Id.* at p. 828.) And the court went on to reverse because the default judgment was void

---

[12] In its zeal to read the pleadings so as to reach its desired result, the majority describes—more accurately misdescribes—how a court is to read McClain and Harrell's pleading, this footnote in 16: "Plaintiffs, in their amended complaint, alleged that the complaint was brought against 'Karen Kissler, individually and *dba* Karen Kissler, Esq. and Alternatives, A Health Collective.' (Italics added.) References to Kissler in the complaint, including in the breach of contract action, should be read in light of this initial definition of the parties. Thus, in alleging that Kissler employed plaintiffs to grow marijuana plants and agreed to pay a certain price, that '[d]efendant's agents came to [the property, owned by Kissler, where the marijuana was being grown] without notice to Plaintiffs where they cut down and removed 99 marijuana plants,' that plaintiffs were paid far less than promised, and that when they asked Kissler when she would pay she told them their claims were 'ridiculous,' the complaint reasonably must be understood to refer to that Kissler individually and Kissler doing business as Karen Kissler, Esq. and Kissler doing business as Alternatives. We infer that Judge Ottenweller read the complaint as it logically should be read, since he found Alternatives and Kissler were in essence 'one and the same.' "

and had to be set aside under section 473 because the amended complaint failed to state a cause of action. Exactly like here.

Moreover, there was no showing that any purported service on Alternatives contained the notice required by Code of Civil Procedure section 412.30. Again, the Benchbook is instructive:

"A default judgment may not be entered against the following defendants:

"● A corporation or unincorporated association or against any person individually in an action against the corporation or association when the copy of the summons served does not contain the notice specified in [Code of Civil Procedure section] 412.30." (Benchbook, *supra*, § 16.44 at p. 1579)

One looks long and hard to find recent cases affirming default judgments. That paucity, along with the guiding principles set forth by the Supreme Court, indicates to me that denials of relief from defaults should be few and far between. And to the extent that any denial is proper, it must be against a defendant who has flouted the system, or has shown disdain for it. That does not describe the setting here, where Kissler was not only in Judge Ottenweller's own words, an "active" participant, she was the genesis of the dispute between the parties, in a lawsuit which she won, resulting in a judgment that she could not be liable. The default judgment here holds the opposite, that she is liable, as is Alternatives, Inc. against which a claim was not even alleged! To affirm that judgment is a manifest miscarriage of justice. And thus, I dissent.

35

_____
Richman, J.

*McClain et al. v. Kissler et al.* (A152352)

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Peter K. Ottenweller

Counsel:

Wykowski & Associates, Henry G. Wykowski and Andrew F. Scher for Defendants and Appellants.

Katie McClain, in pro. per.; Jonothan Harrell, in pro. per.; Ball Law Corporation, Jonathan Ball for Plaintiffs and Respondents.